STATE v. EARL D. BEARDSLEY.[1]

December 5, 1902.

Nos. 13,270—(20).

### Contract for Insurance.

A certain contract construed, and *held* to be for life insurance, within the definitions found in Laws 1895, c. 175.

### Concealment by Use of Words.

The real character of such a contract, and the acts to be performed under it, cannot be concealed or changed by the use or absence of words in the contract itself. It is immaterial that such a contract does not, on its face, purport to be one for insurance.

### Insurance Act.

All corporations, associations, copartnerships, or individuals doing an insurance business in this state are within the purview of chapter 175, *supra*, and, with their agents, must comply with the law requiring them to procure licenses to transact business.

### Assignments of Error.

Certain assignments of error in reference to rulings of the court at the trial considered and disposed of.

Defendant was convicted in the district court for Ramsey county, Bunn, J., of the offense stated in the opinion. From the judgment of conviction, defendant appealed. Affirmed.

*John H. Ives* and *Neal & Eppstein*, for appellant.

*T. R. Kane* and *O. H. O'Neill*, for the State.

COLLINS, J.

The defendant was indicted and convicted, under Laws 1895, c. 175, § 101, of the offense of assuming to act as the agent of an insurance company without first having procured a license or certificate of authority to so act.

That he solicited and secured the person named in the indictment to enter into a contract, a copy of which was made a part thereof, and that, as agent, he delivered it to the same person, is

[1] Reported in 92 N. W. 472.

not disputed, so the principal question at issue is whether this contract was one for insurance, within the meaning of the insurance code, above mentioned. Upon this question it is contended by defendant's counsel that this particular instrument is not a contract of insurance, as such a contract is defined by either section 3 or section 63 of chapter 175, or within any of the provisions of chapter 175; and, again, that as the company which executed the contract is a copartnership, and not a corporation, it has an absolute right to solicit and deliver insurance contracts, without regard to any of said provisions, and without any state supervision whatsoever. Other minor points are made by counsel for defendant, to some of which we shall refer later.

1. It appears from the contract that the Home Co-operative Company, for which defendant was acting, and whose contract he delivered as its agent, is a copartnership organized in the state of Kansas. It consists of a number of citizens of that state, and under that name enters into its contracts as party of the first part; the party of the second part being the holders of the contracts. The latter are not in any sense members of the copartnership or company. The company is entitled to all profits which may arise in carrying out its contracts, and must bear all losses, if there be any. A stipulated amount is paid monthly by each contract holder as a premium, and there is no provision for levying assessments upon such holders to cover losses or shortages. The company assumes the only obligation there is in the contract, aside from the holder's promise to pay his monthly premium, and therefore it is not co-operative; nor is it a benevolent association, except as it may, through its plan of operations, be beneficial to a contract holder or to his family, precisely as is a life insurance company to a beneficiary in case of the death of the assured. Contract holders co-operate with each other to the same and to no greater extent than do policy holders in ordinary life insurance companies. Each holder of a contract—all contracts being numbered in consecutive order—promises to pay a membership fee of $3, and the sum of $1.35 each month, up to and prior to what is designated as the maturity day of his contract. Of this $1.35, $1 is credited to the account of the contract holder, and is to be applied

to the purchase of a home for him, according to a somewhat mystifying plan previously formulated. Ten cents of the payment is kept as a reserve fund to meet "contingent liabilities" of the company when performing its contracts, and the balance, twenty-five cents, is taken to defray the company expenses, including compensation for services. What is done with the membership fee, does not appear.

The monthly payments of $1.35 are made by a contract holder until fifty dollars have been accumulated from payments upon his contract, and from payments upon like, but subsequently made and numbered, contracts with other persons; and then this particular contract is deemed to have matured, and its holder entitled to receive instalments of $50 per month, to be applied on the payment for his home until the full sum of one thousand dollars is paid; and, when this sum is paid in monthly instalments, the contract is fully performed by the company. If the holder of a matured contract avails himself of his instalment privilege, and prepares to build a house, on which the company is to have security, he must then and thereafter pay to the company $5.35 each month, instead of $1.35. Five dollars of this amount is placed to his credit, and the balance, thirty-five cents, is disposed of precisely as it had been before his contract matured. When the monthly payments, of five dollars each, aggregate the sum of $1,000, less the amount the holder had to his credit on account of one dollar payments per month before his contract matured, the lien of the company for the money advanced expires, the debt is discharged, and a clear title to the property is vested in the contract holder. This is the plan of operations through which the latter is supposed to finally secure his home, fully paid for, and free of all liens.

It seems to be admitted that, were it not for subsequent provisions, this contract would not be one for insurance, but the state relies upon another clause; the disability referred to being that of the contract holder, which is as follows:

"Should his disability be total, permanent, and determined by satisfactory evidence, the unpaid balance of one thousand dollars provided for in this contract shall be paid to clear the home of the party of the second part, and his indebtedness to the parties of

the first part shall be discharged, and the title to the property, if held by the parties of the first part, shall be conveyed as he may direct. In the event of his death before all advance payments to him shall have been returned to the first parties, the parties of the first part shall pay the balance, if any, of the one thousand dollars contracted for, and shall cancel his indebtedness to the first parties, and, if the title to the property purchased is in the first parties, they shall convey the same to his wife, if any; if there shall be no wife, then to his heirs. * * * If the second party is over fifty years of age at the signing of this contract, the provisions to give his wife or heirs a clear title in case of his death, unless accidental, do not apply. In case of his death, unless accidental, his wife or heirs must continue the payments according to the obligations of the second party."

It is contended in behalf of the state that this provision constitutes the contract one for insurance, and subjects the defendant to the license clause of chapter 175. By this provision, if the contract holder's disability becomes total and permanent, the company agrees to pay the unpaid balance of the one thousand dollars which the holder has obligated himself to pay to it in five dollar instalments, and for which payment the company has a lien upon the property, for the purpose of clearing and discharging the lien; and, if this agreement is performed, the entire indebtedness is cancelled, and the title to the property vested as the holder may direct. In the event of the holder's death before all monthly payments have been made by him, and his obligation to the company discharged in full, the latter agrees to pay the balance of his indebtedness, and to cancel the amount remaining unpaid, and, if it holds title to the property, to convey the same to his wife, if there be one, and, if not, to his heirs. The precaution is taken by the company to exclude from the operation of this last provision contract holders over the age of fifty years, unless death shall be accidental. This promise becomes effective only in the case of disability or death, and, if either occur, the company is obliged to release its claim for further payments, and to remit the remaining debt.

This is a valuable promise made to the contract holder for a consideration, namely, his monthly payments. If he becomes disabled, the company promises to do an act of value to him. If he dies, the promise is to do an act of value to his widow or to his

heirs; that is, an act equivalent to, and actually involving, the payment of money, conditioned upon the cessation of human life. The real character of this promise, or of the act to be performed, cannot be concealed or changed by the use or absence of words in the contract itself; and it is wholly immaterial that on its face this contract does not expressly purport to be one of insurance, and that this word nowhere appears in it. Its nature is to be deter-  mined by an examination of its contents, and not by the terms used. The performance of the contract may be enforced by the holder in case of disability, or by his widow or heirs in case of his decease. If it does not come within the definition of an insurance contract, as found in section 3 (that is, if it is not an agreement by which one party, for a consideration, promises to pay money or its equivalent, or to do some act of value to the assured, upon the destruction or injury of something in which the other party has an interest), it involves the payment of money or something else of value to the family or representatives of the holder, conditioned upon the continuance or cessation of human life, and is covered by the definition found in section 63. It is an agreement involving and providing, in effect, for the indirect payment of money by the relinquishment of a debt; and there is no substantial distinction between such an agreement or obligation and the ordinary life insurance policy. The obligation in each case is conditioned upon the cessation of human life.

2. Chapter 175 covers individuals, whether acting singly, or grouped into partnerships or associations, as well as corporations. It does not distinguish between them or their agents, and in section 63 it is expressly provided that all corporations, associations, partnerships, or individuals doing business in this state under any charter, compact, agreement, or statute of this state or any other state, shall be deemed life insurance companies, and must comply with the rules and regulations respecting authority to act, so that, whenever any restriction or regulation is imposed by the statute, it embraces and includes partnerships as well as corporations. Nowhere in the code are individuals or firms prohibited from engaging in the insurance business, and they could not be, lawfully. In fact, their right so to do is expressly recog-

nized in sections 1 and 63. That many of the sections of the code pertain solely to corporations, does not affect this proposition, for there must be regulations for the government of corporations not applicable to individuals or partnerships.

It has been held that the insurance code applies to foreign, mutual, unincorporated associations, as well as those properly incorporated, and that neither can do business in this state without a license. Seamans v. Christian Brothers Mill Co., 66 Minn. 205, 68 N. W. 1065. In a sister state it has been held, under a statute quite similar to our own, that the required certificate must be obtained by individuals or associations doing insurance business, as well as by corporations. State v. Stone, 118 Mo. 388, 24 S. W. 164. Such a conclusion is inevitable unless we are to permit irresponsible persons engaged in a business which needs supervision by the authorities to compete with corporations under surveillance. The supervisory provisions of the insurance code are a legitimate exercise of the police powers of the state, and there is no discrimination in favor of our own citizens. They apply with equal force to all companies and to all persons, the object of the law being to protect the public. All agents acting for individuals, partnerships, associations, or corporations engaged in the insurance business must be licensed by the insurance commissioner before so acting and transacting business, and all are prohibited therefrom without this license.

Nor do any words of chapter 175 furnish ground for the assertion that the design of the language used in section 63 is to require licenses to do business to be obtained solely by such companies or concerns as are organized under some statute, and are thereby given privileges by law,—such, for instance, as statutory corporations. In Missouri, K. & T. Co. v. Krumseig, 23 C. C. A. 1, 77 Fed. 32, 41, the United States circuit court of appeals, Eighth circuit, had under consideration a contract precisely like that before this court in Missouri, K. & T. Co. v. McLachlan, 59 Minn. 468, 61 N. W. 560, which the late Associate Justice MITCHELL, speaking for the court, there characterized as having been contrived for the purpose of evading either the insurance or usury laws, or both, of this state. We there held it to be an unsuccessful attempt to evade the

usury laws. In the Krumseig case it was not only held that the contract was a cover for usury, but also that it was a "combination of a mortgage loan  *  *  *  and a life insurance policy," and, viewed as a contract for life insurance, either in whole or in part, it was void for noncompliance with the insurance laws of Minnesota. The contract there under consideration does not really differ from the one now before us, which we regard as a combination of a loan of money with security and a life insurance policy. It has the features and essentials of both, and the defendant, having solicited and acted as an agent in procuring it, without being licensed as an insurance agent, violated the law before referred to, and was properly convicted on the merits.

3. It is unnecessary to consider at this time whether or not this company can comply with the laws of this state, and procure a license to do business. That question will arise when it attempts to observe and conform to the law, and will first be disposed of by the insurance commissioner.

4. There is nothing whatever in the claim that the state should have been required to elect whether it would proceed under section 89 or section 101. Clearly, this was an indictment under section 101, and there was no election to be made. Nor was there any error whatsoever upon the part of the court when it refused to require the state to elect whether it would proceed for the offense of soliciting insurance on March 28, or for the offense of negotiating insurance when defendant personally delivered the contract on March 31. His delivery of the contract completed his acts, and when soliciting insurance, as well as when making the delivery, he was acting as an insurance agent, without the required authority. This was the offense charged in the indictment.

5. Nor is there anything in the assignment that the court erred when it permitted copies of certain newspapers to be introduced in evidence, and allowed the witnesses to state that certain printed matter therein were advertisements which they obtained from defendant. This tended to show that he was acting as the agent of the company named in the indictment, and, we presume, was introduced for that purpose.

Judgment affirmed.