**FIRST NATIONAL BANK OF EAST-ERN ARKANSAS, A National Banking Association, Appellee,**

v.

**Ron TAYLOR,\* Commissioner of the Insurance Department for the State of Arkansas, Appellant,**

**Arkansas Credit Insurance Association (Intervenor Below), Appellant.**

No. 89–1260.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 18, 1990.

Decided June 25, 1990.

Rehearing and Rehearing En Banc Denied July 27, 1990.

---

\* Ron Taylor succeeded Robert M. Eubanks, III, as Commissioner of the Arkansas Insurance Department before the notice of appeal was filed. Thus, he is substituted as an appellant. *See* Fed.R.Civ.P. 25(d)(1).

Lee Douglas, Little Rock, Ark., for appellant.

Philip Hicky, II, Forrest City, Ark. and James Gillespie, Jr., amicus curiae, Washington, D.C., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

LAY, Chief Judge.

In July, 1987, First National Bank of Eastern Arkansas (FNB) began offering debt cancellation contracts as additional-cost options to customers borrowing $10,000 or less. These contracts obligated FNB to cancel the unpaid loan balance remaining at the borrower's death, regardless of the cause of death. FNB offered the debt cancellation contracts at rates that did not vary with a borrower's age or medical condition. A regulation promulgated by the United States Comptroller of Currency (Comptroller) authorizes national banks to enter into debt cancellation contracts. *See* 12 C.F.R. § 7.7495 (1990).[1]

■ In September, 1987, the Arkansas Insurance Department notified FNB that debt cancellation contracts were the equivalent of credit life insurance policies, and thus subject to state insurance laws. The Department requested that FNB stop offering the contracts.[2] FNB complied, but then brought a suit in federal district court seeking a declaration that the Department's action was preempted by the National Bank Act, 12 U.S.C. §§ 21–216d (1988). Jurisdiction was invoked pursuant to 28 U.S.C. §§ 1331 and 2201.[3] The dis-

---

1. 12 C.F.R. § 7.7495 provides:
    A national bank may provide for losses arising from cancellation of outstanding loans upon the death of borrowers. The imposition of an additional charge and the establishment of necessary reserves in order to enable the bank to enter into such debt cancellation contracts are a lawful exercise of the powers of a national bank and necessary to the business of banking.

2. The Department indicated in its letter to FNB that the bank's failure to stop offering debt cancellation contracts would result in enforcement action by the Commissioner. Under Ark.

Code of 1987 Ann. § 23–65–105 (Supp.1989), the Commissioner has authority to issue a cease and desist order against any person who engages in the business of insurance without a license.

3. We raised a question about jurisdiction on our own motion after argument. In *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952), the Court suggested that federal-question jurisdiction may be lacking when a declaratory complaint sets forth a claim of federal right that is in the nature of a defense to a threatened state court action. Based on that dicta, and the "well-

trict court[4] held that the National Bank Act protected FNB's power to enter into debt cancellation contracts, and that the contracts did not constitute the "business of insurance" under section 2 of the McCarran–Ferguson Act, 15 U.S.C. § 1012 (1988). The Commissioner of the Arkansas Insurance Department (Commissioner) appeals.[5] We affirm the district court.

## I.

■ Our inquiry in this case is limited to the question whether the Arkansas Insurance Commissioner may prohibit FNB from entering into debt cancellation contracts.[6] The Commissioner initially urges that such a prohibition does not conflict with federal law because the National Bank Act does not grant national banks the power to offer debt cancellation contracts. The Commissioner argues that in authorizing the contracts, the Comptroller has exceeded his authority. We disagree.

■ In addition to enumerating specific powers, including the lending of money, the National Bank Act grants national banks the power to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). The Comptroller, through 12 C.F.R. § 7.7495, has interpreted "incidental powers" to include the offering of debt cancellation contracts, and the Supreme Court has made clear that the Comptroller's interpretation of the National Bank Act must be given "great weight":

> "It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws. See *First National Bank v. Missouri*, 263 U.S. 640, 658 [44 S.Ct. 213, 215, 68 L.Ed. 486] [1924]."

*Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 403–04, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987) (quoting *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971)). The Comptroller's determination as to what

---

pleaded complaint" rule, this court in *Home Federal Savs. & Loan Ass'n v. Insurance Dep't of Iowa*, 571 F.2d 423 (8th Cir.1978) and in *Lawrence County v. South Dakota*, 668 F.2d 27 (8th Cir.1982), rejected federal jurisdiction because the preemption claim was in the nature of a defense to a state action. However, the Supreme Court has since made clear that a party may apply directly to federal court for relief based on an affirmative claim of preemption. See *Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 259 n. 6, 105 S.Ct. 695, 697 n. 6, 83 L.Ed.2d 635 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). Jurisdiction is not defeated simply because a plaintiff requests declaratory relief rather than an injunction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950); 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3566, at 99 (1984). Thus, we have jurisdiction to review the merits of this case.

**4.** The Honorable George Howard Jr., United States District Judge for the Eastern District of Arkansas.

**5.** The Arkansas Credit Insurance Association intervened below, and joins the Commissioner in this appeal.

**6.** Because the Commissioner's request that FNB stop offering debt cancellation contracts was grounded on FNB's failure to obtain a state license, the parties dispute whether this case should be regarded as one of prohibition or regulation. However, Arkansas law requires licensees to submit to extensive state regulation, including maintenance of specific capital and surplus levels, payment of licensing fees, financial information disclosure, and inspection by the Commissioner. Compliance with these requirements would pervert FNB's status as a federal instrumentality. Moreover, 12 U.S.C. § 484 (1988) prohibits states from exercising "visitorial powers" over national banks. For these reasons, we regard the Commissioner's request as a prohibition on FNB's issuance of debt cancellation contracts.

The Comptroller, in an amicus curiae brief, concedes that there may be particular state insurance regulations (e.g., those limiting premium rates) which apply to debt cancellation contracts and which do not conflict with national banking powers. We agree with the Comptroller's argument that these issues are more properly addressed on a case-by-case basis.

activities are authorized under the National Bank Act should be sustained if reasonable. *See Clarke,* 479 U.S. at 406, 409, 107 S.Ct. at 761, 762.

■ The "incidental powers" of national banks are not limited to activities that are deemed essential to the exercise of express powers. Rather, courts have analyzed the issue by asking whether the activity is closely related to an express power and is useful in carrying out the business of banking. For example, the Supreme Court, in *Colorado Nat'l Bank v. Bedford,* 310 U.S. 41, 60 S.Ct. 800, 84 L.Ed. 1067 (1939), held that a national bank was authorized to operate a safe-deposit business, reasoning that this activity was incidental to the bank's express power to accept special deposits. *Id.* at 49–50, 60 S.Ct. at 803–804. *See also Securities Indus. Ass'n v. Clarke,* 885 F.2d 1034, 1049 (2d Cir.1989) (sale of mortgage "pass-through" certificates authorized by National Bank Act because "convenient and useful" in connection with bank's sale of mortgage loans), *cert. denied,* —— U.S. ——, 110 S.Ct. 1113, 107 L.Ed.2d 1021 (1990); *American Ins. Ass'n v. Clarke,* 865 F.2d 278, 281–82 (D.C.Cir. 1988) (sale of municipal bond insurance by national bank subsidiary falls within incidental powers because it is essentially a credit product); *M & M Leasing v. Seattle First Nat'l Bank,* 563 F.2d 1377, 1382 (9th Cir.1977) (National Bank Act authorizes personal property leasing that is incidental to national bank's express power to "loan money on personal property"), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *cf. Arnold Tours, Inc. v. Camp,* 472 F.2d 427, 433–34 (1st Cir. 1972) (operation of full-scale travel agency not within incidental powers because not convenient or useful in connection with any express power).

As the district court found, the debt cancellation contracts at issue in this case are directly related to FNB's expressly-authorized lending power. The contracts are sold only in connection with loans made by FNB, and involve only FNB and its borrowing customers. The contracts provide borrowers with a convenient method of extinguishing debt in case of death, and enable FNB to avoid the time, expense, and risk associated with attempting to collect the balance of the loan from a borrower's estate. Because we agree with the district court that the debt cancellation contracts are directly connected to FNB's lending activities, we deem the Comptroller's authorization of this activity as reasonable and within the incidental powers granted by the National Bank Act.

## II.

■ Having found that the National Bank Act authorizes national banks to offer debt cancellation contracts as "incidental" to the business of banking, we find in favor of FNB under the principle of federal preemption. Because national banks are considered federal instrumentalities, *e.g., Franklin Nat'l Bank v. New York,* 347 U.S. 373, 375, 74 S.Ct. 550, 552, 98 L.Ed. 767 (1954), states may neither prohibit nor unduly restrict their activities. *See id.* at 378–79, 74 S.Ct. at 553–54; *Anderson Nat'l Bank v. Luckett,* 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692 (1944). Thus, the National Bank Act preempts the Commissioner's authority to prohibit FNB from offering debt cancellation contracts.

■ The Commissioner argues, however, that section 2 of the McCarran–Ferguson Act limits the preemptive power of the National Bank Act in this case because it forbids courts to construe the National Bank Act in a manner that impairs a state's authority to regulate the "business of insurance." 15 U.S.C. § 1012(b).[7] The Commissioner urges that because debt cancella-

---

7. The relevant portion of section 2 of the McCarran–Ferguson Act reads as follows:

   (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

   (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance * * *.

15 U.S.C. § 1012.

tion contracts have the same effect as credit life insurance contracts, they are subject to the exclusive regulatory authority of the state under the McCarran–Ferguson Act. We reject this argument. We hold that because the debt cancellation contracts offered by FNB fall within the incidental powers granted by the National Bank Act, they do not constitute the "business of insurance" under the McCarran–Ferguson Act.

■ We reach this holding for two reasons. The primary reason is that the McCarran–Ferguson Act was not directed at the activities of national banks. The McCarran–Ferguson Act was passed by Congress in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that the insurance industry was subject to regulation by Congress under the Commerce Clause, and that insurance company activities were subject to federal antitrust laws. *Id.* at 553, 64 S.Ct. at 1174. The McCarran–Ferguson Act was designed to preserve traditional state regulation and taxation of insurance companies, and to provide insurance companies with a partial exemption from federal antitrust laws. *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 217–18, 99 S.Ct. 1067, 1076–77, 59 L.Ed.2d 261 (1979); *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). In holding that certain pharmacy contracts involving health-care organizations were not the "business of insurance," the Court in *Group Life* expressed doubt as to whether the McCarran–Ferguson Act applied to entities commonly thought to be outside the insurance industry:

> There is not the slightest suggestion in the legislative history that Congress in any way contemplated that arrangements such as the Pharmacy Agreements in this case, which involve the mass purchase of goods and services from entities outside the insurance industry, are the "business of insurance."

\* \* \* \* \* \*

At the time of the enactment of the McCarran–Ferguson Act, corporations organized for the purpose of providing their members with medical services and hospitalization were not considered to be engaged in the insurance business at all, and thus were not subject to state insurance laws. \* \* \* Since the legislative history makes clear that Congress certainly did not intend the definition of the "business of insurance" to be *broader* than its commonly understood meaning, the contemporary perception that healthcare organizations were not engaged in providing insurance is highly significant in ascertaining congressional intent.

440 U.S. at 224–27, 99 S.Ct. at 1079–81 (emphasis in original). *See also Union Labor Life,* 458 U.S. at 133, 102 S.Ct. at 311 ("§ 2(b) [of the McCarran–Ferguson Act] was intended primarily to protect '*intra*-industry cooperation' in the underwriting of risks") (quoting *Group Life,* 440 U.S. at 221, 99 S.Ct. at 1078) (emphasis in original); *United Servs. Auto. Ass'n v. Muir,* 792 F.2d 356, 364 (3d Cir.1986) (Pennsylvania statute prohibiting mergers between banks and insurance companies not protected by McCarran–Ferguson Act because, among other reasons, banks are not entities within the insurance industry), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987).

The McCarran–Ferguson Act was not intended to give states power to regulate beyond that which they had been thought to possess prior to the *South–Eastern Underwriters* decision. As the Court in *SEC v. National Sec., Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) said,

> The McCarran–Ferguson Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation. As the House Report makes clear, "[i]t [was] not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Un-*

*derwriters Association* case." H.R.Rep. No. 143, 79th Cong., 1st Sess., 3 (1945). *Id.* at 459, 89 S.Ct. at 568. *See also Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 880 n. 8, 105 S.Ct. 1676, 1683 n. 8, 84 L.Ed.2d 751 (1985). Yet, well before the *South–Eastern Underwriters* decision, regulation of national banks was within the exclusive domain of the federal government. *E.g., First Nat'l Bank v. California,* 262 U.S. 366, 369, 43 S.Ct. 602, 603, 67 L.Ed. 1030 (1923). This strongly indicates that Congress did not intend the "business of insurance" to encompass lawful activities of national banks.

Our second reason for holding that the debt cancellation contracts offered by FNB are not the "business of insurance" is that debt cancellation contracts issued by banks in connection with loans differ significantly from traditional insurance contracts. Although debt cancellation contracts may, as the Commissioner argues, transfer some risk from the borrower to the bank,[8] the contracts do not require the bank to take an investment risk or to make payment to the borrower's estate. The debt is simply extinguished when the borrower dies. Thus, the primary and traditional concern behind state insurance regulation—the prevention of insolvency—is not of concern to a borrower who opts for a debt cancellation contract. As Justice Brennan said in his concurring opinion in *SEC v. Variable Annuity Life Insurance Co. of America,* 359 U.S. 65 at 90–91, 79 S.Ct. 618 at 631–32, 3 L.Ed.2d 640, "The prevention of insolvency and the maintenance of 'sound' financial condition in terms of fixed-dollar obli-

gations is precisely what traditional state regulation [of insurance] is aimed at." The fact that debt cancellation contracts issued by national banks in connection with loans do not implicate this central concern of insurance regulation, at least as it relates to the ability of the banks to fulfill their obligations under the contracts, adds further support to our holding that debt cancellation contracts should not be considered the "business of insurance."[9]

### III.

In conclusion, we hold that the National Bank Act precludes the Arkansas Commissioner of Insurance from prohibiting FNB, either by direct coercion or through a license requirement, from entering into debt cancellation contracts with its borrowers. The Comptroller has reasonably determined that these contracts are authorized by the National Bank Act, and we think that this determination must control. Therefore, the judgment of the district court is affirmed.

---

**8.** We acknowledge that in addition to the Commissioner a few state appellate courts have found debt cancellation contracts to fall within their states' definitions of "insurance." *See Ware v. Heath,* 237 S.W.2d 362 (Tex.Civ.App. 1951); *Attorney Gen. ex rel. Monk v. C.E. Osgood Co.,* 249 Mass. 473, 144 N.E. 371 (1924); *State v. Beardsley,* 88 Minn. 20, 92 N.W. 472 (1902); *see also United Sec. Life & Trust Co. v. Bond,* 16 App.D.C. 579 (1902). However, state law defining insurance is not controlling on the issue of whether an activity falls within the "business of insurance" as that term is used in the McCarran–Ferguson Act. *SEC v. Variable Annuity Life Ins. Co.,* 359 U.S. 65, 69, 79 S.Ct. 618, 621 (1959).

**9.** The responsibility of ensuring the financial condition of the national banking system has long been committed to the Comptroller. In the case of debt cancellation contracts, the Comptroller has indicated that banks must use prudent banking judgment, which may include the establishment of reserves to cover losses resulting from early debt cancellation. *See* 12 C.F.R. § 7.7495; Letter from J. Michael Shepherd, Senior Deputy Comptroller for Corporate and Economic Programs, to W.D. Glover, FNB Chairman and President, (Jan. 7, 1988) (Trial Ex. 8). If a national bank is engaging in "unsafe or unsound" banking practices, the Comptroller, under 12 U.S.C. § 1818(b), may issue a cease and desist order.