936 F.2d 66
 59 USLW 2761
 CITICORP, Petitioner,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,
American Council of Life Insurance, Independent Insurance
Agents of America, Inc., National Association of Casualty
and Surety Agents, National Association of Life
Underwriters, Inc., National Association of Professional
Insurance Agents, National Association of Surety Bond
Producers, Professional Insurance Agents of Pennsylvania,
Maryland, and Delaware, Inc., Independent Insurance Agents
of Delaware, Delaware Association of Life Underwriters,
State of Delaware, and Delaware Bankers Association, Intervenors.
 No. 953, Docket 90-4124.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 7, 1991.
Decided June 10, 1991.
 
 Michael S. Helfer, Washington, D.C. (David S. Swayze, Joseph A. Fillip, Jr., Wilmington, Del., Carl T. Solberg, George G. Baxter, III, Alan F. Liebowitz, New York City, Christopher R. Lipsett, Murray A. Indick, Wilmer, Cutler & Pickering, Washington, D.C., on the brief), for petitioner.
 Jacob M. Lewis, Civ. Div., Dept. of Justice (Stuart M. Gerson, Asst. Atty. Gen., Anthony J. Steinmeyer, Civ. Div., Dept. of Justice, J. Virgil Mattingly, Gen. Counsel, Richard M. Ashton, Associate Gen. Counsel, Katherine H. Wheatley, Federal Reserve Bd., Washington, D.C., on the brief), for respondent.
 
 
 1
 A. Gilchrist Sparks, III (Michael Houghton, S. David Peress, Morris, Nichols, Arsht & Tunnell, and Marsha Kramarck, Deputy Atty. Gen., Wilmington, Del., on the brief), for intervenors Delaware Bankers Ass'n and State of Del.
 
 
 2
 David Overlock Stewart (Martin E. Lybecker, Alan G. Priest, Raymond C. Ortman, Jr., Ropes & Gray, Washington, D.C., on the brief), for intervenor American Council of Life Ins.
 
 
 3
 Jonathan B. Sallet (Ann M. Kappler, Jenner & Block, Washington, D.C., on the brief), for remaining intervenors.
 
 
 4
 John L. Warden, H. Rodgin Cohen, Lisamichelle Davis, Sullivan & Cromwell, New York City, submitted a brief for amicus curiae New York Clearing House Ass'n.
 
 
 5
 John D. Hawke, Jr., Melanie L. Fein, Pauline B. Heller, David F. Freeman, Jr., Arnold & Porter, Washington, D.C., submitted a brief for amicus curiae Conference of State Bank Supervisors.
 
 
 6
 John J. Gill, Michael F. Crotty, American Bankers Ass'n, James T. McIntyre, Jr., McNair Law Firm, Richard M. Whiting, Ass'n of Bank Holding Companies, Wendy B. Samuel, David E. Danovitch, Charlotte M. Bahin, Nat. Council of Sav. Institutions, Washington, D.C., Marcia Z. Sullivan, Consumer Bankers Ass'n, Arlington, Va., and Lawrence R. Uhlick, Institute of Intern. Bankers, New York City, submitted a brief for amici curiae American Bankers Ass'n, Ass'n of Bank Holding Companies, Ass'n of Reserve City Bankers, Consumer Bankers Ass'n, Ass'n of Banks in Ins. Institute of Intern. Bankers, and Nat. Council of Sav. Institutions.
 
 
 7
 Before LUMBARD, NEWMAN, and ALTIMARI, Circuit Judges.
 
 JON O. NEWMAN, Circuit Judge:
 
 8
 Once again we consider an aspect of the broad issue of the extent to which banks are authorized to engage in nonbanking activities. That issue was before us just two years ago in Independent Insurance Agents of America, Inc. v. Board of Governors, 890 F.2d 1275 (2d Cir.1989) (Merchants II ), cert. denied, --- U.S. ----, 111 S.Ct. 44, 112 L.Ed.2d 21 (1990). We there ruled, in agreement with the Federal Reserve Board ("the Board" or "the Fed"), that the Bank Holding Company Act ("BHCA" or "the Act") did not preclude bank subsidiaries of a bank holding company from selling insurance. The question now before us is the one left open in Merchants II--whether the BHCA extends the regulatory authority of the Fed to the subsidiary of a holding company's bank subsidiary.
 
 
 9
 The question arises on a petition for review filed by Citicorp challenging the Board's September 5, 1990, order. That order requires one of Citicorp's bank subsidiaries, Citibank Delaware, to terminate insurance activities that the bank subsidiary was conducting through its operating subsidiary, Family Guardian Life Insurance Co. ("Family Guardian"). Though mindful of the deference due an agency's construction of the statute it is administering, we conclude that, once the BHCA has been construed to leave the regulation of a holding company's subsidiary banks to their chartering authorities, the Act cannot sensibly be interpreted to reimpose the authority of the Fed on a generation-skipping basis to regulate the subsidiary's subsidiary. We therefore grant the petition for review and vacate the Board's order.
 
 Background
 
 10
 Before introducing the facts, it will be helpful to outline briefly the pertinent statutory provisions of the BHCA, the construction placed on those provisions at the Board's urging by this Court in Merchants II, the Board's regulation concerning operating subsidiaries, and the pertinent aspects of the Delaware regulatory framework.
 
 
 11
 The Statutory Framework. The principal regulatory powers of the Fed concerning bank holding companies are set forth in sections 3 and 4 of the Act. 12 U.S.C. Secs. 1842, 1843 (1988). Section 3 requires Board approval of the acquisition of ownership or control of any bank by a bank holding company, with narrow exceptions not here relevant. Section 3 sets forth factors governing acquisition approval, focusing on the competitive effect of the proposed acquisition, the financial and managerial resources of both the holding company and the acquired bank, and the convenience and needs of the community served. Id. Sec. 1842(c).
 
 
 12
 Section 4 of the Act, the provision ultimately at issue in this litigation, contains two sets of prohibitions. First, it specifies, in what might be called the "ownership clause," that a bank holding company may not "retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company." Id. Sec. 1843(a)(2). Second, it provides, in what might be called the "activities clause," that a bank holding company may not "engage in any activities other than (A) those of banking or of managing or controlling banks ... and (B) those permitted under [section 4(c)(8) of the Act]...." Id. Section 4(c)(8) sets forth the so-called "closely related to banking" exception to the nonbanking prohibition of the ownership and activities clauses. In relevant part, section 4(c)(8) states that the section 4(a) nonbanking prohibitions shall not apply to
 
 
 13
 shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto, but for purposes of this subsection it is not closely related to banking or managing or controlling banks for a bank holding company to provide insurance as a principal, agent or broker....
 
 
 14
 Id.
 
 
 15
 The Decision in Merchants II. In 1989 the Board approved an application by Merchants National Corporation, a bank holding company, to permit two of its Indiana bank subsidiaries to engage in insurance activities. Merchants National Corp., 75 Fed.Res.Bull. 388 (1989). That ruling was vigorously challenged in this Court by insurance interests who contended that the BHCA was intended to accomplish a nearly complete separation of banking and nonbanking activities by precluding bank holding companies and all entities within their systems from engaging in nonbanking activities, other than the "closely related to banking" activities specifically identified in section 4(c)(8) of the Act. The Board took the position that Congress had not gone so far. In the Board's view, Congress had precluded nonbanking activities by bank holding companies themselves but had not wished to displace the traditional authority of state and national bank chartering bodies to determine what nonbanking activities could appropriately be engaged in by banks that are subject to their regulatory authority, even though such banks were owned by a bank holding company under the jurisdiction of the Fed.
 
 
 16
 The dispute between the Board and the banking interests, on the one hand, and the insurance interests, on the other hand, was a substantial one. Ultimately, we ruled in favor of the Board. Merchants II, 890 F.2d at 1284. We acknowledged that the statute was not entirely clear and that arguments supporting each of the contending positions could plausibly be based on some of the language of the Act, some aspects of the structure of the Act, and some passages from the legislative history. Id. at 1281-84. After canvassing the available evidence, we concluded that the construction urged by the Board was a "reasonable interpretation" of the Act, "one that confides decisions concerning the scope of insurance and other nonbank activities of bank subsidiaries to their national and state chartering authorities." Id. at 1284.
 
 
 17
 In Merchants II we noted the Board's additional position that, although the Act denied the Board authority to preclude bank subsidiaries of a bank holding company from engaging in nonbank activities, it nonetheless empowered the Board to preclude the subsidiaries of bank subsidiaries from engaging in nonbank activities. Though the insurance interests pressed upon us the "apparent awkwardness and perhaps illogic," id. at 1282, of the Board's generation-skipping approach, we confined our ruling to approval of the Board's construction of the Act to permit nonbank activities by bank subsidiaries (the first generation after the holding company), and left for another day the issue of whether the Act could simultaneously be construed to bar nonbank activities by a subsidiary's subsidiaries (the second generation). That day has now arrived.
 
 
 18
 The Board's Operating Subsidiary Rule. Long before the administrative and judicial rulings in Merchants II, the Board had issued Regulation Y, the so-called "operating subsidiary rule," which purports to govern the activities of subsidiaries of a bank holding company. See 12 C.F.R. Pt. 225 (1990) (current version). In general, such subsidiaries must limit their activities to those banking and "closely related to banking" activities permitted by section 4 of the Act. However, one provision of Regulation Y permits state-chartered banks, without the Board's prior approval, to acquire
 
 
 19
 all ... of the securities of a company that engages solely in activities in which the parent bank may engage, at locations at which the bank may engage in the activity, and subject to the same limitations as if the bank were engaging in the activity directly.
 
 
 20
 Id. Sec. 225.22(d)(2)(ii) (emphasis added). Thus, under Regulation Y and the Board's construction of section 4, as endorsed in Merchants II, a subsidiary of a state-chartered bank subsidiary of a holding company may engage in nonbank activities permitted to the bank under state law, provided that the activities are conducted under the same limitations that would apply if the bank were engaging in the activities "directly."[1]
 
 
 21
 The Delaware Regulatory Framework. In May 1990, Delaware enacted the Bank and Trust Company Insurance Powers Act of 1989, 67 Del.Laws, c. 223 (1990) ("the Delaware statute"). The Delaware statute permits Delaware banks, under certain conditions, to engage in insurance activities (other than title insurance). The statute affords the banks the option of conducting insurance activities through a "department" or "division" of the bank or through a subsidiary of the bank. Whichever option is chosen, the statute requires substantial structural barriers between the bank's insurance activities and its banking activities.
 
 
 22
 For example, the statute requires that the assets of the bank may be applied only to satisfy the non-insurance liabilities of the bank and not those of the bank's insurance "division," id. Sec. 8, and the assets of the insurance "division" may be applied only to satisfy the liabilities of that "division" and not the other liabilities of the bank, id. Sec. 22. The statute places a 25 percent limit on the amount of the bank's total capital, surplus, and undivided profits that may be allocated to its insurance "division," id. Sec. 10, and the minimum capital that the bank is required to maintain under Delaware banking law may not be used to meet the separate capital requirements of the "division" imposed by state insurance law, id. Sec. 3. The statute provides that for purposes of the Delaware Insurance Code an insurance "division" of a bank is treated as an insurance company "in the same manner and to the same extent as if it were a separately incorporated subsidiary ... with separate capital accounts, assets and liabilities." Id. Sec. 17.
 
 
 23
 In general, Delaware authorizes its bank commissioner to regulate the banking activities of state-chartered banks and authorizes its insurance commissioner to regulate the insurance activities of a bank's insurance "division." Id. Secs. 5, 38. However, the statute permits the bank commissioner to supervise the insurance "division" whenever he determines that the "division's" activities are "likely to have a materially adverse effect on the safety and soundness of the bank." Id. Sec. 5.
 
 
 24
 Citicorp's Banking and Insurance Activities in Delaware. Citicorp is a bank holding company with assets of more than $200 billion. In 1982, Citicorp obtained a charter from Delaware for Citibank Delaware, a commercial bank wholly owned by Citicorp. Citibank Delaware has assets of more than $2 billion and serves customers in 35 states.
 
 
 25
 In 1986, with the approval of the Fed, Citicorp established Family Guardian as a wholly owned subsidiary to underwrite and sell certain credit-related insurance expressly authorized for bank holding companies by section 4(c)(8)(A) of the BHCA, 12 U.S.C. Sec. 1843(c)(8)(A). The day after the Delaware statute was enacted, Citicorp transferred all of the voting shares of Family Guardian to Citibank Delaware in order to permit Family Guardian to transact the broader range of insurance activities authorized under the Delaware statute for insurance "divisions" and subsidiaries of Delaware banks. Family Guardian then began to expand its operations to include insurance underwriting and other insurance activities within the scope of Delaware law, though beyond the scope of the "closely related to banking" activities specified in section 4(c)(8) of the BHCA.
 
 
 26
 The Pending Litigation. Soon after the expansion of Family Guardian's insurance activities, various insurance industry trade associations filed a petition with the Board, contending that Family Guardian's activities were not permitted under the operating subsidiary rule of Regulation Y. The complainants argued that the barriers required by the Delaware statute between the banking and insurance activities of a Delaware-chartered bank were so substantial that a Delaware bank, such as Citicorp Delaware, could not engage in insurance activities "directly" within the meaning of Regulation Y. Since Citicorp Delaware could not engage in these insurance activities "directly," the argument continued, its subsidiary, Family Guardian, was not operating within the limitations of Regulation Y.
 
 
 27
 The Fed accepted the contentions of the complainants, ruled that the activities of Family Guardian were not authorized by Regulation Y, and concluded that these activities, if not exempted by Regulation Y, were impermissible under the BHCA for an entity owned by a subsidiary of a bank holding company. Citicorp. 76 Fed.Res.Bull. 977 (1990). The Board ordered Citicorp to cause Family Guardian to cease providing any insurance activities beyond those authorized and approved by the Board under section 4(c)(8)(A). Citicorp then brought this petition for review to challenge the Board's ruling.
 
 Discussion
 
 28
 Citicorp makes two arguments. First, it contends that the insurance activities of Family Guardian are permitted for the bank subsidiary of Citicorp by virtue of the Board's operating subsidiary rule. Second it contends that, if the operating subsidiary rule does not permit insurance activities by Family Guardian, the Board lacks statutory authority under the BHCA to proscribe the activities of a subsidiary of a holding company's bank subsidiary.
 
 
 29
 1. Citicorp's Claim under Regulation Y.
 
 
 30
 Regulation Y, as we have noted, permits state-chartered banks to own a subsidiary company "that engages solely in activities in which the parent bank may engage ... and subject to the same limitations as if the bank were engaging in the activities directly." 12 C.F.R. Sec. 225.22(d)(2)(ii). Citicorp contends that the Delaware statute permits a Delaware-chartered bank, like Citicorp Delaware, to sell insurance and leaves it up to the bank whether to operate its insurance activity in a "division" within the bank or in a wholly owned subsidiary of the bank. With that proposition the Fed is in agreement. The dispute concerns the meaning of "directly" in Regulation Y. The Fed takes the position that the extent of separation between a bank and its insurance "division" required by the Delaware statute has the effect of precluding the bank from "directly" engaging in the insurance activities of its "division." Since, in the Fed's view, the bank could not engage in insurance activities "directly" within the bank, Regulation Y does not permit it to do so through an operating subsidiary. Citicorp contends that the separateness of an insurance "division," required by Delaware law, does not prevent the bank from engaging in insurance activities "directly."
 
 
 31
 Citicorp devotes much of its argument on this aspect of the appeal to a detailed analysis of the Delaware statute, an analysis that the Fed does not dispute. As both sides recognize, Delaware clearly permits a Delaware-chartered bank to engage in insurance activities through a "division" located within the bank and just as clearly imposes a host of restrictions designed to achieve a degree of separation between the insurance activities of the bank's insurance "division" and the other activities of the bank. Whether the resulting separation precludes a bank from engaging in insurance activities "directly" within the meaning of Regulation Y is an issue of federal law, not Delaware law.
 
 
 32
 It would be a straightforward interpretation of Regulation Y to read it to mean that a bank may own a non-banking subsidiary so long as the subsidiary is subject to the same limitations that would apply if the activities of the subsidiary were being conducted within the bank itself. Under this reading "directly" would simply mean "within the bank," as distinguished from "through a subsidiary." Indeed, in the BHCA the adverb "directly" is used in this sense. See 12 U.S.C. Sec. 1842(f)(1) (referring to activities in which a qualified savings bank may "engage, directly or through a subsidiary"); id. 12 U.S.C. Sec. 1843(a)(2) (referring to activities in which a bank holding company may be engaged "directly or through a subsidiary"). The Fed's reading, however, gives "directly" substantive content, interpreting it to mean that the bank must engage in the activity not only "within the bank" but in the absence of the degree of separateness mandated by the Delaware statute for a bank's insurance "division."
 
 
 33
 We confess to considerable wonderment as to why the Fed would want to construe its regulation to mean that insurance activities conducted in a "division" of a bank are not conducted by a bank "directly" just because the "division" is surrounded by protections designed to maintain the soundness of both the banking and the insurance activities of the bank. It is not readily apparent why the Fed would be more willing to permit Citibank Delaware to sell insurance if Delaware provided less protection for the bank's assets from the risks of the bank's insurance activities.
 
 
 34
 Moreover, the Fed's reading of its regulation puts considerable strain on the word "limitations" in Regulation Y. That word would sensibly apply to any requirement that a state imposes on a bank's operating subsidiary. For example, if a state were to require the insurance subsidiary of a bank to maintain a specified amount of capital, unencumbered by liabilities arising from the parent's banking business, it would surely make sense to read Regulation Y to mean that the bank must maintain that same amount of capital, equally unencumbered, in its insurance "division" if the bank chooses to sell insurance through a "division" within the bank, rather than through a subsidiary. But the separateness required by Delaware law is a different sort of "limitation." It is structural in nature, requiring the insurance "division" and its assets and liabilities to maintain some degree of distinction from the other activities of the bank.
 
 
 35
 A further cause for concern about the Fed's position is the response of its General Counsel to a specific inquiry from a member of the Delaware House of Representatives during consideration of the bill that became the Delaware statute. The inquiry sought advice as to the significance, for federal regulatory purposes, of the extent of separation between an insurance "division" and the rest of a bank's activities. The General Counsel replied that under the proposed statute, Delaware banks may conduct broadened insurance activities "directly within the bank or in a separate subsidiary of the bank" and noted that, under the Board's operating subsidiary rule, "if a holding company state bank is permitted to conduct an activity directly, the bank may establish a wholly-owned nonbank subsidiary to conduct the activity." Letter of J. Virgil Mattingly, Jr., to the Honorable John F. Van Sant (May 17, 1989) (emphasis added).
 
 
 36
 The Board's treatment of this letter is troublesome. Its brief first points out that the inquiry suggests that the Delaware legislature "was aware of the problems the proposed statute might engender under [the BHCA]." Brief for Respondent at 25. Presumably, the legislator, though "aware of the problems," thought he had gotten an authoritative assurance that the separateness did not preclude the bank from engaging in insurance activities "directly." Not so, says the Board, suggesting that the General Counsel's first use of the adverb "directly" was just a "summary description" of the bill and "not a substantive determination of the scope of the Board's operating subsidiary rule (which was not mentioned until the bottom of the letter's next page)." Id. at 25 n. 10. Surely the inquiring legislator was entitled to think that the General Counsel understood that "directly" was a term of art and that he was not using the term colloquially on page one and technically on page two. Finally, the Board makes the point that the General Counsel's views are "not a determination by the Board." Id. at 25.
 
 
 37
 Despite our considerable unease at the way the Board is construing the word "directly" in its regulation, especially in light of the advice its General Counsel furnished to the Delaware legislature, we are willing to assume, for purposes of this appeal, that the separation mandated by the Delaware statute precludes a bank from operating its insurance "division" "directly." So long as the Board is exercising its statutory authority, it has ample discretion to frame regulations and accord to its chosen words any technical meaning it wishes that does not purport to deny those words any semblance of their ordinary meaning. See United States v. Larionoff, 431 U.S. 864, 872-73, 97 S.Ct. 2150, 2155-56, 53 L.Ed.2d 48 (1977); Soler v. G & U, Inc., 833 F.2d 1104, 1108 (2d Cir.1987), cert. denied, 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988). In this instance, the Board's view that a separate insurance "division" is not being operated "directly" by a bank presses that rule to its limit, and possibly beyond, but we will assume that the Board has fairly interpreted its own regulation and proceed to consider the statutory issue.
 
 
 38
 2. Citicorp's Claim under the BHCA.
 
 
 39
 Citicorp contends that the BHCA does not permit the Fed to regulate the activities of the subsidiary of a bank subsidiary of a holding company. Before the Merchants II litigation, that contention would have posed a substantial issue because a major controversy then existed as to whether the BHCA permitted non-banking activities (other than those specifically authorized by section 4(c)(8)) to be conducted anywhere in a system controlled by a bank holding company. The insurance interests in Merchants II contended that neither a holding company, nor a bank subsidiary, nor the subsidiary of a bank subsidiary could engage in nonbanking activities. However, the Fed disagreed with that interpretation of the Act and argued that the bank subsidiaries of a holding company were beyond the Board's regulatory authority. In the Fed's view, Congress intended to leave unimpaired the primary regulatory authority of state and national bank chartering agencies to determine the activities of institutions under their jurisdiction. We agreed with that construction of the statute.
 
 
 40
 Thus, in the aftermath of Merchants II, we take the Act as if it said in terms, "The Board is without authority to limit the activities of a bank subsidiary of a bank holding company." Now the question is whether the Board may nonetheless regulate the activities of a bank subsidiary's subsidiary. The rationale of the position that the Board successfully urged upon us in Merchants II requires an answer consistent with the interpretation the Board there urged us to adopt. The Board urged, and we agreed, that Congress wanted bank chartering agencies to regulate the activities of banks within their jurisdiction. By virtue of their authority over the banks that they charter, those agencies have ample authority to determine the permissible activities of the subsidiaries owned by the banks. We have been given no reason to believe that Congress wanted the jurisdiction of bank chartering authorities to end at the corporate structure of the bank itself, rather than extend throughout the chain of companies owned by the bank. Surely a bank chartering agency, charged with the responsibility to maintain the soundness of a bank, is vitally interested in the assets owned by a bank, including shares of wholly owned subsidiaries. In the pending case, Delaware has demonstrated that its regulatory authority over Delaware-chartered banks is not confined to activities occurring within the bank, but extends to insurance activities whether conducted within the bank (albeit in a separate "division") or in a subsidiary of the bank.
 
 
 41
 Moreover, the Board has provided no basis for believing that Congress wished to create two classes of state-chartered banks--those owned and those not owned by bank holding companies. Before Merchants II, such an argument was plausible; Congress might have wanted those state-chartered banks owned by holding companies to be confined to banking activities, leaving banks not so owned to have broader activity. But once the Board persuaded us to read the statute to leave all state-chartered banks free to sell insurance, subject to state, not Board, regulation, there is no basis for believing that Congress simultaneously adopted a generation-skipping approach and authorized the Board to bar the subsidiaries of state-chartered banks from selling insurance whenever those banks were in turn the subsidiaries of a holding company.
 
 
 42
 Neither of the two technical statutory arguments tendered by the Board supports the generation-skipping approach. Section 4(a) of the Act provides that no bank holding company shall acquire or retain "direct or indirect ownership or control of any voting shares of any company which is not a bank." 12 U.S.C. Sec. 1843(a)(1), (2). That provision would plainly bar a holding company from using some entity other than a bank to acquire or retain control of a nonbanking company. A holding company may not directly acquire an insurance company, and it may not do so indirectly through some shell corporation, voting trust, or other nonbanking entity. But section 4 and the entire BHCA obviously contemplate that a holding company may own a bank, and if the Act permits the bank to sell insurance, subject to state regulation, it leaves the states equally free to permit bank subsidiaries to sell insurance. That is made explicit in section 7 of the Act, which provides:
 
 
 43
 No provision of this chapter shall be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to ... banks ... and subsidiaries thereof.
 
 
 44
 12 U.S.C. Sec. 1846.
 
 
 45
 The Board also relies on section 2(g)(1) of the Act, which provides that "shares owned or controlled by any subsidiary of a bank holding company shall be deemed to be indirectly owned or controlled by such bank holding company." 12 U.S.C. Sec. 1841(g)(1). There is no doubt that a literal application of this language would mean that Citicorp shall be deemed to own Family Guardian. But the question remains whether, in adding section 2(g)(1) in 1966, Congress intended to extend to the Board the authority to prevent a state-chartered bank like Citicorp Delaware from selling insurance through an operating subsidiary like Family Guardian. Citicorp contends, and we agree, that the purpose of section 2(g)(1) was to make clear that the BHCA applied when a holding company's nonbank subsidiaries controlled, but did not wholly own, another company. See Amend the Bank Holding Company Act of 1956: Hearings on S. 2353, S. 2418 and H.R. 7371 Before a Subcomm. of the Senate Comm. on Banking and Currency, Pt. 1, 89th Cong., 2d Sess. 342 (1966) ("Technical question[ ] ha[s] arisen" regarding applicability of phrase to situation in which a bank holding company "owns less than 50% of the voting shares of" a company that owns another company.). The 1966 amendment was noncontroversial and elicited no opposition from national or state bank regulators who surely would have objected, as they do now, to the contention that the amendment permits the Fed, and not these chartering regulators, to determine what activities may be engaged in by the operating subsidiary of a bank subject to their jurisdiction.
 
 
 46
 Moreover, in the same bill that added section 2(g)(1), Congress amended section 23A of the Federal Reserve Act, 12 U.S.C. Sec. 371c (1988) (current codification), to restrict loans by banks to their "affiliates" and incorporated subsidiary relationships of the BHCA. Act of July 1, 1966, Pub.L. No. 89-485, Sec. 12(a), 80 Stat. 236, 241 (1966). Subsequently, the Board ruled that section 23A did not apply to loans made by a bank to its operating subsidiaries, see 12 C.F.R. Sec. 250.240 (1990) (current version), and Congress codified the Board's interpretation, with an exception not relevant here, when it revised section 23A in 1982:
 
 
 47
 the following shall not be considered to be an affiliate:
 
 
 48
 (A) any company, other than a bank, that is a subsidiary of a member bank....
 
 
 49
 12 U.S.C. Sec. 371c(b)(2).
 
 
 50
 The Board responds to these contentions by assailing Citicorp for making the "assumption" that Family Guardian is an operating subsidiary of Citicorp Delaware. See Brief of Respondent at 30 n. 13. The Board's point here is simply a reaffirmation of its interpretation of Regulation Y: since Citicorp Delaware may not operate Family Guardian "directly" within the bank, it may not operate it as a subsidiary. The argument is entirely unpersuasive on the statutory issue. Even if, as we have indulgently assumed, Regulation Y may plausibly be read to mean that Family Guardian is not the sort of operating subsidiary specifically authorized by that regulation, it cannot be maintained that Family Guardian is not in fact an operating subsidiary of Citibank Delaware. Obviously it is; it operates a business and it is wholly owned by Citicorp Delaware. The Board's strained interpretation of Regulation Y cannot answer the statutory issue of whether the BHCA permits the Board to regulate the activities of an entity that is demonstrably the operating subsidiary of a state-chartered bank.
 
 
 51
 The Fed reminds us that in Merchants II we contemplated the possibility that the Fed might be correct both in its view that the BHCA permitted a state-chartered bank subsidiary of a holding company to be immune from coverage of the BHCA and in its view that the Act nevertheless reached the subsidiary's subsidiary. We there observed that "if the Board is right [in both views], this would not be the first time that Congress has adjusted the competing positions of strong forces with a compromise of imperfect symmetry." 890 F.2d at 1282 (emphasis added) (citation omitted). But in Merchants II, we were required to decide only whether the Board was entitled to read the Act to leave the regulation of the nonbank activities of holding company banks to chartering authorities. We were not obliged to endorse the Board's additional (and "perplexing," id.) view that the Act reached the subsidiary's subsidiary. The fact that we peered into the abyss of conflicting statutory constructions that occur in federal law and noted that in some instances they reflect political realities does not mean that we accepted both aspects of the Fed's views. In Merchants II we had to decide whether the possibility of an
 
 
 52
 asymetrical construction of the BHCA precluded the view advanced by the Fed with respect to coverage of holding company banks, and we agreed with the Fed that it did not. Now we face the issue whether the Fed's view concerning BHCA coverage of the subsidiary's subsidiary is only a tolerable inconsistency or an entirely untenable construction, and we conclude it is the latter.
 
 
 53
 The conclusion we reach enjoys the support of the other two of the three bank regulating authorities of the nation, the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC"). The Chairman of the FDIC advised the Fed in 1989, "In our view, subsidiaries of state banks are beyond the scope of the Bank Holding Company Act...." Letter of L. William Seidman to Alan Greenspan, April 28, 1989. Similarly, the OCC informed the Fed, "[T]he Office of the Comptroller of the Currency (OCC) does not believe that the BHCA gives the FRB the authority to regulate or define permissible activities of state banks, whether conducted directly or through subsidiaries." Letter of Dean S. Marriott to William W. Wiles, April 28, 1989. In neither instance were the views of these national bank regulators grudging disclaimers of desirable authority; on the contrary, both the FDIC and the OCC expressed the belief that leaving operating subsidiaries of state chartered banks subject to the regulating authority of state banking regulators, whether or not such banks were owned by bank holding companies, was both a sound construction of the BHCA and a desirable policy of bank regulation.
 
 
 54
 We recognize that courts are not obliged to defer to interpretations of a statute made by agencies not responsible for its administration, see Dep't of Treasury v. Federal Labor Relations Authority, 837 F.2d 1163, 1167 (D.C.Cir.1988). It is the Fed, not the FDIC or the OCC, that administers the BHCA. Nevertheless, having reached the conclusion that the BHCA, in light of the construction previously urged upon us by the Fed, must be understood to leave the subsidiaries of state-chartered banks to state regulating authorities, we take some comfort in knowing that those with significant national responsibilities for maintaining a sound banking system share our view of the statute. We would surely be reluctant to read the Act to preclude coverage of subsidiaries of holding company banks in the face of unanimous views by national bank regulators that such a construction is bad law and bad policy. The disagreement among national banking regulators does not leave us free to adopt whatever construction seems best in our judgment. We are still obliged to begin our task by according deference to the view of the agency directly responsible for administering the Act. But when that view clashes with the construction of the statute that the same agency has urged us to adopt, we need not elevate deference to blind obseisance, and we can notice the contrary view of significant banking regulators.
 
 
 55
 In Merchants II, it is likely that we would have upheld the Board had it chosen to interpret the BHCA to bar nonbanking activities throughout a bank holding company's system, even though we ultimately agreed with the Board's interpretation that the Act permitted bank subsidiaries of holding companies to engage in nonbanking activities. As we acknowledged in Merchants II, the BHCA is not clear as to whether it requires bank holding companies and all subsidiaries within their systems to observe a total separation from nonbanking activities. But however that issue is resolved, the Act must be interpreted as a whole and must retain some internal coherence. The Board ruled that whether bank subsidiaries may engage in nonbanking activities is a matter for the chartering authorities of those banks, and not for the Board. Once that decision was made, we cannot agree that the Act can sensibly be construed to permit the Board to displace bank-chartering authorities in determining what activities are permitted for the subsidiaries of bank subsidiaries.
 
 
 56
 The petition for review is granted, and the order of the Board is vacated.
 
 
 
 [1]
 A comparable regulation applies to operating subsidiaries of national banks. 12 C.F.R. Sec. 225.22(d)(1) (1990)