**NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION, Plaintiff,**

v.

**SWEEN CORPORATION, Maurice A. Sween, and Keith B. Brekke, Defendants.**

**Civ. File No. 3–95–387.**

United States District Court, D. Minnesota, Third Division.

Feb. 20, 1996.

Thomas L. Kimer, Faegre & Benson, Minneapolis, MN, for plaintiff.

David Kenneth Hackley, Hackley Law Office, Minneapolis, MN, for Maurice A. Sween.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

## INTRODUCTION

This matter is before the Court upon the parties' Cross–Motions for Summary Judgment. Also now before the Court is the Plaintiff's Motion to Amend its Complaint and to Dismiss Certain Defendants without prejudice.

The Plaintiff brought this action on the Defendant's refusal to pay for advisement service fees of about $2.9 million pursuant to an agreement entered by the parties in October 1994. Upon initial consideration of this matter, the Court raised the issue of subject-matter jurisdiction *sua sponte,* and requested the parties provide memoranda in response. The Plaintiff had asserted this Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331, 1367 and 2201. The Court concluded that the Plaintiff inappropriately relied on § 2201 as conferring subject-matter jurisdiction, and questioned federal-question jurisdiction under §§ 1331 and 1367. *See* Memorandum and Order (Clerk Doc. No. 19).

In response, the Plaintiff agrees that its Complaint failed to raise a "substantial federal question" that would afford this Court jurisdiction under §§ 1331 and 1367. So that this Court would retain the case based on diversity jurisdiction, however, the Plaintiff now moves the Court to dismiss, without prejudice, Defendant Sween Corporation and Keith B. Brekke, and to permit it to amend its Complaint accordingly. The Defendants argue that, in fact, Count I is not a mere prediction of the Defendants' defense, but a necessary element to the Plaintiff's breach of contract claim in Count II. However, the Defendants do not dispute the Plaintiff's Motion to Amend its Complaint and to Dismiss the non-diverse Defendants. Because the Court grants the Plaintiffs' Motion to Amend, *see* Fed.R.Civ.P. 21 ("Parties may be dropped or added by order of the court on motion of any party ... at any stage of the action."); Fed.R.Civ.P. 15 (liberally permitting amendments to pleading by court leave or by written consent of the parties), the Court need not consider the Defendants' position that Count I is a required element of Count II, and therefore not merely a response to the Defendant's predicted defense.

## FACTUAL BACKGROUND [1]

Sween Corporation (Sween) is a Minnesota corporation which develops and manufactures

1. The parties have provided their Stipulation as to Material Facts ("Stipulated Facts") for the

skin care products. Defendant Maurice Sween of Rochford, South Dakota, founded Sween in 1968. Mr. Sween was a chief executive officer and chairman of Sween Corporation's Board of Directors until February 28, 1995. Until February 28, 1995, when he owned nearly 90% of its shares, Mr. Sween owned the majority of Sween stock. Coloplast Corporation is a Georgia corporation, and is a wholly owned subsidiary of Coloplast A/S, a company incorporated in Denmark.

Keith Brekke is a resident of North Mankato, Minnesota. For at least 8 years, he was Vice President and General Manager of Sween Corp. Since December 1994 he has been chief executive officer of Sween. Until February 28, 1995, Brekke owned about 3% of Sween stock. Richard Ash and Marilyn Sween owned a total of about 7% of Sween stock. On February 28, 1995, Coloplast Corp. acquired all Sween stock from Defendants Maurice Sween and Keith Brekke, and from Ash and Marilyn Sween.

Norwest Bank Minnesota South Central, N.A., is a national bank established in Mankato, Minnesota, pursuant to the National Bank Act. All common stock of Norwest Bank Minnesota South Central is owned by Norwest Corporation. Norwest Corporation is a bank holding company under the Bank Holding Company Act. For at least five years, Norwest Bank Minnesota South Central has conducted banking business with Sween Corp., Maurice Sween and Brekke.

Norwest Bank Minnesota, N.A., is a national bank established in Minneapolis, Minnesota pursuant to the National Bank Act. It provides investment advisory services through its Norwest Corporate Finance Division, including advising clients on valuation issues relating to businesses, advising and assisting in the sale or purchase of businesses, capital raising activities, and general corporate finance activities. Norwest Corporate Finance is not a separate legal entity. Since its formation in 1979, Norwest Corporate Finance has represented over 50 sellers in merger transactions similar to its representation of Defendants.

Norwest Corporation owns the common stock of Lindeberg Financial Corporation and Norwest Holding Company. Norwest Corporation, either directly or through Lindeberg Financial Corporation and Norwest Holding Company, owns the common stock of Norwest Bank Minnesota. Norwest Bank Minnesota has not conducted any deposit loan or trust business with any of the Defendants.

From June 30, 1994, through March 1, 1995, Norwest Bank Minnesota employed R. Jeffrey Maas, Peter Slocum, and D. Christian Osborne in its Norwest Corporate Finance Division. Neither Maas, Slocum nor Osborne has ever been licensed as a broker or salesperson under Minnesota Statutes Chapter 82. Additionally, neither of them has ever been licensed as a securities broker or dealer by Minnesota or any federal authority. Maas is a Chartered Financial Analyst and a Registered Investment Advisor under the Securities and Exchange Commission (SEC).

Norwest Bank Minnesota has never applied to the Comptroller of the Currency (Comptroller) or the Federal Reserve Board (Fed) for permission to conduct investment advisory services through its Norwest Corporate Finance Division. As a national bank, Norwest Bank Minnesota is subject to regulation by the Comptroller of the Currency. The Comptroller of the Currency audited Norwest Corporate Finance in its April 23, 1991 examination of the fee-based services provided by Norwest Bank Minnesota. The Comptroller raised no questions or objections and did not comment upon the authority or ability of Norwest Bank Minnesota to conduct corporate finance through Norwest Corporate Finance.

Many national banks throughout the country have corporate finance divisions or departments which provide investment advisory services relating to mergers and acquisitions. For more than ten years Bankers Association for Corporate Finance ("BACF") has existed to provide an avenue for discussion

purposes of the present summary judgment motions. The Court gleans this background from those Stipulated Facts.

and education about products and techniques relating to corporate finance activities including mergers and acquisitions. In 1994, the BACF had 27 bank members. The 1994 BACF Directory reflects that at least 10 of the member banks conduct their mergers and acquisitions investment advisory services through a division of a national banking association while others conduct the business through a separate subsidiary of either a national bank or bank holding company.

Norwest Bank Minnesota's Corporate Finance Division has performed services for the Defendants. In 1987 it performed business valuation services for Sween Corporation. Pursuant to an Engagement Agreement dated June 7, 1993, the Norwest Corporate Finance Division provided investment advisory services in connection with a potential acquisition for Sween. Brekke, as president of Sween, and Maas, on behalf of Norwest Corporate Finance Division, executed the Engagement Agreement.

In the summer of 1994, Maurice Sween contacted Maas, and advised him that the Sween Corp. shareholders wanted to explore possibilities relating to creating liquidity. Norwest Corporate Finance Division analyzed several alternatives. In an August 1994 meeting with Defendants, Norwest Corporate Finance Division presented alternatives, including a private sale of Sween, a public offer of Sween stock, and a partial sale of the Sween enterprise. Later, Maurice Sween contacted Maas and requested a proposal for selling Sween or its outstanding stock in a private sale. Norwest Corporate Finance Division then prepared and delivered to Defendants a draft Engagement Agreement regarding the sale of Sween.

Maas, Slocum and Osborne of Norwest Corporate Finance Division, and Defendants' attorney David K. Hackley, met at Norwest Corporate Finance offices. The parties negotiated the terms of the Engagement Agreement. Each made suggestions, changes and modifications. Norwest Corporate Finance Division provided a second draft Engagement Agreement and sent it to the Defendants and Hackley. Defendants with Hackley revised the Engagement Agreement further and forwarded it to Norwest. Following a phone conversation between Hackley and Maas, the Defendants prepared the final agreement on Sween stationery and forwarded it to Norwest with a check for the initial payment in the amount of $20,000. The Plaintiff and Defendants executed the Engagement Agreement on or about October 10, 1994. There was no agreement or understanding not reduced to writing, and there has been no subsequent modification of the agreement.

The Engagement Agreement authorizes Norwest Corporate Finance as the exclusive advisor to initiate negotiations regarding the sale of all or part of Sween Corporation. Prior to execution of the Agreement, there was no representation or agreement regarding how the sale would be accomplished.

Immediately after executing the Agreement, Norwest Corporate Finance prepared and circulated to prospective buyers an extensive brochure on computer disk and on paper. The brochure promoted Sween Corporation's products, personnel, past financial results, and future potential to a person acquiring it. Norwest Corporate Finance contacted over 135 potential buyers. By December 1994, it recommended to Defendants to narrow the list to four prospective purchasers who indicated an initial interest in purchasing Sween for $55,000,000 to $75,000,000. The Defendants agreed. These four prospects brought teams to Mankato from December 11 to December 16, 1994, to meet with Sween personnel and Norwest Corporate Finance personnel to investigate and evaluate the business. On December 11, the two top ranking executives of Coloplast A/S, who had come from Denmark, met personally with Maurice Sween and Brekke.

After these meetings ended, Maas and Norwest Corporate Finance Division functioned as the go-between to the prospective buyers and the sellers. Coloplast indicated it would consider paying between $65,000,000 and $70,000,000. Maurice Sween insisted on $80,000,000.

On December 18, 1994, representatives of Coloplast called Maas and indicated Coloplast was prepared to execute a letter of

intent to purchase at $80,000,000, and requested a meeting in New York at the offices of its legal counsel. Maas called Maurice Sween, advised him of the New York meeting, and set up the meeting. Maurice Sween, Brekke and Hackley attended the New York meeting on behalf of Sween and its shareholders. Maas attended on behalf of Norwest Corporate Finance, and advised Maurice Sween. Coloplast CEO-elect Sten Schibye and attorneys Leonard Matsunaga and Miles Prentice attended the meeting on behalf of Coloplast. Coloplast presented a letter of intent to purchase at the meeting. All persons present at the meeting participated in the negotiation of the terms of the letter of intent. Coloplast attorneys then redrafted the letter of intent, and Coloplast and the Defendants entered into it. In the letter of intent, Coloplast agreed to purchase, at its option, either all the assets or all of the shares of Sween Corporation on February 28, 1995. The purchase obligation was contingent upon a satisfactory detailed "due diligence" examination of Sween Corporation, to be followed by the execution of a comprehensive purchase agreement.

The due diligence examination by Coloplast's legal, financial and banking team immediately followed at Mankato, Minnesota, and continued for two weeks. The parties then began negotiating a stock purchase agreement. Defendants retained attorney Douglas Hemer to assist negotiating and drafting of the stock purchase agreement. Maas initiated a two-day meeting of all principals and advisors at Hemer's law offices. During the first day, Hackley and Hemer represented the Defendants, and Matsunaga and Prentice represented Coloplast. On one or more occasions, Maas and Maurice Sween attended the meeting and participated in negotiations. Coloplast's principals attended the second day. With respect to certain items, Maurice Sween negotiated directly with Schibye. Subsequently, the negotiating parties entered into a Stock Purchase Agreement on or about February 27, 1995. At all times throughout the negotiations leading to the Stock Purchase Agreement, Defendants were represented by legal counsel. Norwest Corporate Finance Division did not draft or prepare any part of the Stock Purchase Agreement.

At the close of business on February 28, 1995, the essential parties held a closing pursuant to the terms of the Stock Purchase Agreement. The Stock Purchase Agreement required Maurice Sween not to compete with Sween Corporation for five years in exchange for $500,000. At the closing, Mr. Sween received the $500,000 payment. All Sween stock was then transferred to Coloplast's Georgia subsidiary. Also at the closing, Sween shareholders received $72,500,000. Coloplast simultaneously performed in full all of its obligations pursuant to the Stock Purchase Agreement.

Section 1.2 of the Stock Purchase Agreement states:

### Purchase Price

a. The aggregate purchase price for all of the Shares (the "purchase price") is Seventy–Eight Million Five Hundred Thousand and 00/100ths United States Dollars (US $78,-500,000), subject to adjustment pursuant to sections 1.3 and 7.1.

The adjustments pursuant to sections 1.3 and 7.1 total $753,845. That is, the Sween shareholders' refund back to Coloplast was $753,845 following a post-closing audit completed on April 25, 1995. The purchase price (before the adjustments and adding $500,000 paid for Maurice Sween's non-competition) is approximately $19,000,000 higher than the parties initially anticipated as a minimum acceptable "upset" price in the listing agreement and $9,000,000 higher than the high end of Coloplast's first-indicated purchase price. Defendants expressed complete satisfaction with the amount paid for the shares of Sween Corporation.

In addition to the initial $20,000 payment, the Defendants paid out-of-pocket disbursements of $2,392.02 on November 22, 1994, and $2,907.43 on December 29, 1994. In the course of performing the contract, Norwest has advanced $2,732.88 for out-of-pocket costs. These advances have not been reimbursed.

In connection with the purchase of Sween on February 28, 1995, the selling sharehold-

ers did not pay the $385,000 existing debt of the corporation; it remained the debt of Sween Corp. after the change in the ownership. Also, the selling shareholders did not discharge existing liabilities of Sween to pay future commissions to its former key employees; these commission liabilities remain the obligation of the corporation. During negotiations preceding the execution of the Stock Purchase Agreement, the parties estimated the amount of these aggregate obligations to have a present value of $500,000.

On February 28, 1995, the Defendants and the minority shareholders also entered into a "Shareholders Sharing Agreement" between themselves, not required by the Stock Purchase Agreement. The Shareholders Sharing Agreement did not include Coloplast or Norwest Bank Minnesota as parties. It created a "Reserve Account". The former shareholders created this Reserve Account for their own purposes, for convenience in avoiding claims against the former escrow account, for paying fees and costs in connection with the transaction (including any fee determined due to Norwest Bank Minnesota), and for the adjustment of matters between themselves. The shareholders funded this account with $4,500,000 of the $72,500,000 paid directly to the shareholders by Coloplast. The $753,845 refund to Coloplast was made from this account.

Coloplast deposited $6,000,000, the balance of the purchase price, into escrow pursuant to an Escrow Agreement executed contemporaneously with the closing of the Stock Purchase Agreement, as required by the Stock Purchase Agreement. Norwest is not a party to the Escrow Agreement.

Norwest fully performed its obligations under the Engagement Agreement with Defendants from October 10, 1994 through February 28, 1995. Other than the amounts set forth above, the Defendants have refused to pay Norwest.

Norwest brought Count I of the present action seeking a declaratory judgment that its Corporate Finance Division's business is incidental to its banking business and that Norwest therefore is not required to possess a Minnesota real estate broker's license to maintain an action to collect the advisory fee

as provided in the Engagement Agreement. In Count II Norwest claims the Defendants breached the Engagement Agreement by failing to pay the advisory fees, and in Count III Norwest seeks attorneys' fees and expenses incurred in connection with enforcing the Engagement Agreement. Norwest now moves, and the Defendants cross-move, for summary judgment regarding all of Norwest's claims.

## DISCUSSION

 Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11. For the present motions the parties have stipulated to material facts.

The ultimate question before the Court is whether the Defendants are obliged to pay Norwest the fee the Defendants promised to pay under the October 10, 1994 Engagement Agreement between the parties. The Defendants argue Minnesota law prohibits Norwest from collecting the fee. They point to chapter 82 of the Minnesota Statutes. First, they contend that Norwest is a "broker" within the meaning of that chapter. In part, the relevant statute provides that a "broker" is,

> any person who ... for another and for commission, fee or other valuable consideration or with the intention or expectation of receiving the same directly or indirectly lists, sells, exchanges, buys, rents manages, offers or attempts to negotiate a sale ... of any business opportunity or busi-

ness, or its goodwill, inventory, or fixtures, or any interest therein.

Minn.Stat. § 82.17 subd. 4(c). Norwest does not dispute that the facts of this case bring it within the chapter's definition of "broker." Minnesota law further states,

No person [required by this chapter to be licensed] shall bring or maintain an action in the courts of this state for the collection of compensation for the performance of any of the acts for which a license is required under this chapter without alleging and proving that the person was a duly licensed real estate broker or salesperson at the time the alleged cause of action arose.

Minn.Stat. § 82.33 subd. 1. As discussed above, the parties agree that neither Norwest nor its Corporate Finance Division employees involved in this matter were licensed pursuant to chapter 82.

Norwest forwards two theories to support its position that the Defendants cannot, with chapter 82, shield themselves from their promise to pay Norwest's fee. First, it asserts in its Complaint (and Amended Complaint) that Minnesota law exempts it from the chapter's general license requirement. The particular statute upon which Norwest relies provides that the term "broker" does not encompass various entities, including a bank, "when engaged in the transaction of business within the scope of its corporate powers as provided by law." Minn.Stat. § 82.18(e). The Defendants argue that federal law did not authorize Norwest to enter the Agreement. If correct, of course the Defendants' argument would defeat both of Norwest's grounds to escape Minnesota's broker licensing requirement. The Court therefore turns to the question of whether federal law permitted Norwest to enter the Agreement in dispute.

## I. Federal Authority to Enter Agreement

■ Norwest is a national bank. The standard for considering a national bank's authority is long settled: National banks are the creature of Congress, and Congress, therefore, establishes the contours of national bank power. *Easton v. Iowa*, 188 U.S.

220, 23 S.Ct. 288, 47 L.Ed. 452 (1903). Because a national bank's authority derives only from statute, a national bank has no inherent power, and no power at all except those powers conferred by Congress. *City of Yonkers v. Downey*, 309 U.S. 590, 60 S.Ct. 796, 84 L.Ed. 964 (1940). Relevant to the conflict before the Court today, Congress has vested each national bank with the authority "to exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh.

The present issue turns on this "incidental powers" clause. Norwest argues that the Agreement constitutes such an incidental power, and that this power is "self executing"; that is, it contends that Norwest had authority to enter the agreement without any further congressional legislation or regulatory action. The Defendants contest both points, arguing that the Agreement was *ultra vires*, or beyond Norwest's authority under 12 U.S.C. § 24 Seventh, and that even if section 24 Seventh would permit Norwest to enter the Agreement, banking regulations regarding a national bank's authority to so act required Norwest to seek and secure federal administrative approval before entering the Agreement. Because Norwest did not first obtain this administrative permission, argue the Defendants, Norwest is without legal authority to demand the fee the Defendants promised to pay when they signed the Engagement Agreement.

### A. Incidental Power to Enter Engagement Agreement

■ The parties appropriately begin their dispute concerning whether the bank activity at issue here is within the "incidental powers" clause of 12 U.S.C. § 24 Seventh by presenting cases that have interpreted that statute. The Court will begin with a discussion of the case law provided by the parties, and then turn to the other support relied on by the parties in support of their contrary positions.

### 1. Case Law Application

The Defendants argue essentially that the Engagement Agreement provided for bro-

kerage services. They assert that these services, performed without a state brokerage license, fall beyond the incidental powers permitted under 12 U.S.C. § 24 Seventh. The Defendants rely on *Guaranty Mortgage Co. v. Z.I.D. Associates, Inc.,* 506 F.Supp. 101 (S.D.N.Y.1980). Norwest insists the Engagement Agreement provided instead for *advisory* services, and argues case law to supports the asserted authority to enter the Agreement to provide these services.

In *Guaranty Mortgage,* the District Court for the Southern District of New York considered a brokerage agreement entered by a national bank, whereby the defendant hotel development corporation agreed to pay the bank a brokerage commission for procuring commitments, on behalf of the defendant corporation, for construction and financing loans in a hotel project. The bank brought the action to obtain the brokerage fees after it allegedly performed its brokerage duties. However, the bank had no license as required by state law to serve as a broker. The *Guaranty Mortgage* court addressed whether federal law authorized the bank under 12 U.S.C. § 92 to serve as loan broker and to receive a commission. The court first held that although § 92 authorized loan brokering by national banks in some circumstances, those circumstances were express and specific, and did not occur in the bank's case. Thus, under the statutory interpretation doctrine of *expressio unius est exclusio alterius,* the court read § 92 to preclude the bank's agreement. The court next considered whether the bank was authorized through the incidental powers clause of 12 U.S.C. § 24 Seventh, to broker the loans. The court followed the standard set out in *Arnold Tours, Inc. v. Camp,* 472 F.2d 427, 432 (1st Cir.1972), and held that the loan brokerage agreement was not within the bank's incidental powers.

The Court does not follow the Defendants' urging to make *Guaranty Mortgage* the "anchoring point" of the decision today. As noted, that court considered a bank action that was actually prohibited under the *expressio unius* doctrine; it would have been difficult, indeed, to find an implied power to commit a particular act in a general statute, immediately after finding the same act impliedly *prohibited* by a more specific statute.

Norwest greatly emphasizes *First National Bank of Eastern Arkansas v. Taylor,* 907 F.2d 775 (8th Cir.1990), and *NationsBank of North Carolina, N.A., v. Variable Annuity Life Insurance Co.,* —— U.S. ——, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (*VALIC*). In *Taylor,* the Eighth Circuit considered whether the Comptroller of the Currency exceeded his authority in authorizing national banks to enter debt cancellation contracts. The *Taylor* court found that the National Bank Act authorizes national banks to offer debt collection contracts as an "incidental power" to the business of banking. Therefore, the Comptroller did not exceed his authority by so deciding. However, the court reached this conclusion only after determining (1) that debt cancellation contracts were "directly connected" to the plaintiff bank's expressly authorized lending activities; (2) that the bank sold the contracts only in connection with loans made by the bank; and (3) that the bank's contracts involved only the bank and customers who borrowed from the bank. *Taylor,* 907 F.2d at 778.

In contrast, in the present case Norwest does not dispute the Defendants' assertion that neither the buyer nor the sellers of Sween Corporation were customers of Norwest. The *Taylor* court noted with approval that "courts have analyzed the issue [of bank authority] by asking whether the activity is closely related to an express power and is useful in carrying out the business of banking." *Id.* Contrary to Norwest's assertion, the questioned bank activity in *Taylor* was far more "closely related" to an activity for which banks have express power than the questioned activity before the Court today. Furthermore, the *Taylor* court began with the presumption of finding an implied power, as the Comptroller had already interpreted 12 U.S.C. § 24 Seventh as including debt cancellation contracts. *Id.* at 777.

In *VALIC, supra,* the Supreme Court considered whether the Comptroller properly granted a national bank's application for the bank's brokerage subsidiary to act as an agent in the sale of annuities. The Court first established that "the 'business of bank-

ing' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated," provided that discretion is within "reasonable bounds." *VALIC*, — U.S. at —— n. 2, 115 S.Ct. at 814 n. 2. Despite the apparent breadth of this holding, however, the Court notes that *VALIC*, like *Taylor*, involved judicial review of administrative decisions. Given that procedural setting, the *VALIC* court also presumed the administrative interpretation was apt and would defer to that interpretation under the reasonableness standard of judicial review as provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *see VALIC*, — U.S. at ——–——, 115 S.Ct. at 813–15 (discussing and applying *Chevron* standard).

The *VALIC* Court went on to hold the Comptroller reasonably granted permission to the plaintiff bank to allow its brokerage subsidiary to broker annuities. Like *Taylor*, the *VALIC* decision is distinguishable from the present case due to its procedural and factual setting. Procedurally, unlike *VALIC*, as noted, the present case does not involve presumptive deference to a prior, direct administrative decision. Factually, *VALIC* involved the brokerage of annuities, and the *VALIC* Court rested on substantial authority to support its determination that annuities were closely akin to the type of financial investment instruments banks have traditionally brokered. Particularly, the *VALIC* decision in this regard rested on *First National Bank of Hartford v. City of Hartford*, 273 U.S. 548, 559–60, 47 S.Ct. 462, 466, 71 L.Ed. 767 (1927), and *Securities Industry Assn. v. Board of Governors of Federal Reserve System*, 468 U.S. 207, 215, 104 S.Ct. 3003, 3008, 82 L.Ed.2d 158 (1984). In *Hartford*, the Supreme Court held that a national bank acted within its incidental powers when it invested in, and sold real estate mortgages. However, the mortgages at issue were origi-

nated by the bank or acquired by the bank by discount. 273 U.S. at 559–60, 47 S.Ct. at 466. In *Securities Industry Assn.*, the Supreme Court considered a Federal Reserve Board decision to approve a bank holding company's acquisition of a subsidiary securities brokerage business. The brokerage was limited to "the purchase and sale of securities for the account of [bank] customers" and did not include investment advice to the purchaser or seller. 468 U.S. at 220–21, 104 S.Ct. at 3011. At least construing all factual inferences in favor of the Defendants, the present case involves the brokerage of a deal more removed from traditional service to bank customers than the activities considered in *VALIC, Hartford,* or *Securities Industry Assn.*. For these reasons the Court does not find the cases chiefly relied upon by the parties dispositive of the motions now before the Court.

Nevertheless, the Court finds the Supreme Court's reasoning in *VALIC* instructive. The *VALIC* Court answered whether the phrase "business of banking" under § 24 Seventh was to be broadly or narrowly construed. Prior to *VALIC*, the phrase could be read narrowly, as merely a heading for the five powers immediately following it.[2] *See, e.g., Arnold Tours, Inc., v. Camp*, 472 F.2d 427 (1st Cir.1972) (finding operating a full-scale travel agency not within a national bank's incidental power because it was not convenient and useful in connection with the performance of activities within its express powers). By determining that the "business of banking" encompasses activities beyond the enumerated powers of § 24 Seventh, the *VALIC* Court broadened the scope of activities within a national bank's incidental powers. Hence, in considering the issue in light of administrative decisions and opinions, the Court will apply the more liberal standard as announced in *VALIC*.

*2. Administrative Agency Interpretation*

 Norwest argues that it is the Comptroller, not the Fed, who regulates na-

---

**2.** The expressly enumerated powers of § 24 Seventh are as follows: (1) discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; (2) receiving deposits; (3) buying and selling exchange, coin, and bullion; (4) loaning money on personal security; (5) obtaining, issuing and circulating notes according to the provisions of title 62 of the Revised Statutes. 12 U.S.C. § 24 Seventh.

tional banks. The Court agrees that, generally, the Comptroller is charged with regulation of national banks and the Fed is charged with the regulation of bank holding companies. 12 U.S.C. § 27(b)(2); 12 U.S.C. §§ 1843 & 1844; *In re Southeast Banking Corp.*, 827 F.Supp. 742, 746 (S.D.Fla.1993) ("national banks are regulated by the office of the Comptroller of the Currency, while bank holding companies are subject to the Board of Governors of the Federal Reserve System"), *rev'd on other grounds*, 69 F.3d 1539 (11th Cir.1995); *Owensboro National Bank v. Moore*, 803 F.Supp. 24, 31 (E.D.Ky. 1992) ("Unlike national banks, which are primarily regulated by the Comptroller of the Currency, primary regulatory authority for bank holding companies was placed with the Board of Governors of the Federal Reserve System."), *aff'd*, 44 F.3d 388 (6th Cir.1994); *but compare Whitney National Bank v. Bank of New Orleans and Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965) (applying 12 U.S.C. § 1842(a) as requiring Fed to have exclusive original jurisdiction to pass on proposed acquisition of an existing or newly formed bank by a bank holding company), *with* 12 U.S.C. § 1842(b) (requiring the Fed to notify the Comptroller and consider the Comptroller's views and recommendations if the acquired or acquiring bank is to be a national banking institution). Nevertheless Norwest also argues that both the Comptroller and the Fed would include Norwest's activity in this case as a permissible nonbanking activity. Because this Court should give considerable weight to a reasonable construction of an indefinite regulatory statute adopted by the agency charged with construing it, the Court first considers whether the Comptroller would find Norwest's actions to be within its incidental powers. *See Arkansas State Bank Commissioner v. Resolution Trust Corp.*, 911 F.2d 161, 174 (8th Cir.1990) ("The Comptroller of the Currency's interpretation of the National Bank Act is entitled to great deference."); *Independent Bankers Association of America v. Clarke*, 917 F.2d 1126, 1129 (8th Cir. 1990). For additional guidance and because of the parallel in regulatory authority, the Court will also consider whether the Fed would find Norwest's actions to be within Norwest's incidental powers.

Norwest first cites the April 1991 Comptroller examination of Norwest Corporate Finance's the fee-based services. Because the Comptroller raised no questions or objections regarding Norwest's "authority to conduct corporate finance through Norwest Corporate Finance," Stipulated Facts ¶ 10, Norwest concludes that "the Comptroller believes that Norwest's corporate finance activities are solidly within its authority as being incidental to banking." Norwest Br. Supp.Mo.Summ.J. at 12. While the Court does not agree with the Defendants that this fact would be relevant only if the examiners were "highly competent law school graduates," the Court finds the examination to provide little guidance. Norwest presents no evidence and makes no argument demonstrating that the services examined in 1991 were substantially the same as the activity now under scrutiny, initiated by an agreement entered more than three years after the 1991 Comptroller examination.

Norwest next points to 12 C.F.R. § 5.34, by which the Comptroller regulates national banks in the acquisition or operation of operating subsidiaries. Because operating subsidiaries of national banks are permitted to perform functions that the parent bank can perform, argues Norwest, the Court should consider Comptroller decisions concerning advisory services of bank subsidiaries in deciding whether Norwest's activities are authorized by § 24 Seventh. Norwest directs the Court to several Comptroller letters, and the Comptroller's January 1995 proposed revision to § 5.34.

In the cited May 1982 letter, Office of the Comptroller Assistant Director to the Legal Advisory Services Division, Peter Liebesman, responded to the question of whether a national banking association "can offer merger and acquisition brokerage services to non-financial institutions." Liebesman answered that in his opinion, a national banking association may offer "financial advisory services" on mergers and acquisitions as an incidental power. In addition to the financial planning, research and counselling that by definition easily fit under the "advisory" label, Liebes-

man indicated his belief that such "intermediary activities" as making inquiries into the interest of other parties, arranging meetings of the interested parties, and introducing the parties, are also permitted. The Court agrees this letter demonstrates that the Comptroller would find financial advisory services concerning mergers and acquisitions an incidental banking power, and that this service includes financial planning, research and counselling, as well as the introduction of buyers to sellers.

In a June 1982 letter, the Comptroller's Manager of Bank Structure Analysis, James E. Brennan, informed Robert M. Lichten of Chase Manhattan Bank that Chase's application for permission to establish operating subsidiaries had been approved. The letter noted that the application merely represented an internal reorganization to transfer to the operating subsidiaries services formerly provided by the parent bank. This letter contains no details of that bank's request sufficient to add any significant guidance regarding how the Comptroller would classify the questioned activity now before the Court.

Finally, in a December 9, 1994 letter, Frank Maguire, Senior Deputy Comptroller for Corporate Activities, responded to a national banking association's notice of the bank's intent to establish four operating subsidiaries. The Comptroller granted the requested permission to provide financial and strategic advisory services by noting the Office of the Comptroller "has permitted national banks and their operating subsidiaries to provide financial and strategic advisory services to their customers, including services related to recapitalizations, mergers, acquisitions and other means of expanding business operations." The Court agrees this letter supports the reasonable interpretation of § 24 Seventh that national banks may provide advisory services regarding mergers and acquisitions.

The Defendants give no response to these letters. Instead, they offer their own Comptroller letter, written in April 1982, in support of their proposition that fee *brokerages* generally are not permitted activities. Thus, like ships passing in the night, Norwest argues that the Comptroller would permit the *advisory* services" allegedly rendered in this case, and the Defendants counter that the Comptroller would not permit the *"brokerage* services" allegedly rendered in this case. Nothing in the cases or the Comptroller letter provided by the Defendants support a finding that national banks are not authorized by 12 U.S.C. § 24 Seventh to so provide advice.

The additional administrative evidence provided by the parties is helpful. In a November 1994 proposal to amend 12 C.F.R. § 5.34, the Comptroller expressed the view that § 24 Seventh permits operating subsidiaries of national banks to provide financial advice or counseling regarding mergers and acquisitions. Office of the Comptroller Notice of Proposed Rulemaking, 59 Fed.Reg. 61,034 (1994). Regulation Y, which applies to subsidiaries of bank holding companies, in relevant part states the following:

> [A bank holding company or subsidiary may] provid[e] advice, including rendering fairness opinions and providing valuation services, in connection with mergers, acquisitions, divestitures, joint ventures, leveraged buyouts, recapitalizations, capital structurings, and financing transactions (including private and public financings and loan syndications); and conducting feasibility studies . . . .

12 C.F.R. § 225.25(b)(4)(vi)(A)(1). This regulation clearly contemplates rendering advice regarding mergers and acquisitions. Pursuant to the above discussion, the Court holds that § 24 Seventh would permit Norwest to contract with Defendants to provide advice regarding the sale of all or part of Sween Corporation. The Court now considers Defendants' argument that the Agreement actually contemplated a brokerage.

The Defendants argue that Norwest merely attempts to "hide behind the 'advisory' label." The Engagement Agreement was written on Sween Corporation letterhead. Despite the Defendants' own description in the Agreement of the status of Norwest as "our exclusive *advisor*," to receive "an *[a]dvisory* fee," Agreement at 1 (emphasis added), the Defendants now insist the Agreement's language understates Norwest's role in the transaction. However, by its terms

the Engagement Agreement requires only Norwest's advice and payment by the Defendants of the advisory fee upon the completed sale of Sween Corporation.

Nevertheless, the Court finds certain relevant terms of the Agreement to be ambiguous. For the purposes of the Defendants' summary judgment motion, the Court construes any disputed fact in Norwest's favor. From that perspective, a reasonable interpretation of the "advisory" service language would be that the Agreement obliged Norwest simply to provide the type of "financial and strategic advisory services" as contemplated and permitted in the Comptroller's interpretive letters, discussed above. Particularly, as in the May 1982 letter provided by Norwest, the Engagement Agreement here could fairly be read to authorize Norwest merely to provide Defendants with "financial planning, research and counselling, as well as the introduction of buyers to sellers." The fact that Defendants apparently drafted the Engagement Agreement that describes Norwest as an "advisor," or at least agreed to that title specifically, would tend to support such an interpretation.

On the other hand, the Agreement authorizes Norwest to act as the Defendants' "exclusive advisor *to initiate negotiations* regarding the sale of all or part of Sween." Construing the facts in the Defendants' favor for the purposes of Norwest's summary judgment motion, another reasonable interpretation of this language could be that Norwest was to enter negotiations on behalf of the Defendants in the sale of Sween. Indeed, the Agreement expressly requires the Defendants to pay Norwest the advisory fee if, within 36 months of the Agreement's termination, a sale is completed to "a party with whom *[Norwest] had substantial negotiations* regarding the contemplated Transaction." The Agreement is otherwise strangely silent as to what Norwest's duties as "exclusive advisor" would entail; nowhere does the Agreement define what specific, or even general advice Norwest was to provide the Defendants for the substantial "advisory fee" it would earn contingent upon the sale or agreement to sell all or part of Sween Corporation. The parties by stipulation agree that

Norwest's Maas attended the meeting of Coloplast and Sween shareholders, and that he "participated in negotiations."

From this, despite the parties' stipulation to certain facts, it is clear the parties greatly dispute the nature of the Agreement; according to Norwest, the Agreement obliged it to provide financial advice; but according to the Defendants, the Agreement obliged Norwest to broker a deal to sell Sween Corporation and enter substantive negotiations to conclude the sale. The facts and reasonable inferences therefrom could support either position. Thus, the Court finds a disputed issue of fact as to whether the services for which Norwest now demands payment were "advisory" or more substantive in nature, and must therefore determine whether this disputed fact would be material to the outcome of this case.

The question then becomes whether, under § 24 Seventh, providing the type of "brokerage" service the Defendants allege Norwest agreed to provide in this case is an activity incidental to the business of banking. The parties provide the Court no judicial or regulatory decision directly on point, but the Court finds a 1988 Comptroller interpretive letter concerning LaSalle National Bank to be instructive. OCC Interpretive Letter, 1988 WL 391571 (June 20, 1988) (unpublished). In that letter, the OCC responded to a proposal that a national bank's subsidiary, which was to be located in the bank's main office, would conduct private placements of debt and equity securities on behalf of businesses who, *inter alia*, were planning mergers or acquisitions. In the proposed scheme, the customer would request that the subsidiary provide the services and would negotiate the fee; the subsidiary would provide advice concerning the structure of proposed financing, would assist in preparing private placement memoranda, and would identify and contact potential investors. In finding that the bank's proposal was a permitted activity, the OCC letter acknowledged that national banks may furnish advice and related placement assistance to customers as an incident to the business of banking. The letter further stated,

"In assisting private placement of securities, banks typically make recommendations regarding the terms and timing of the transaction, assist in the preparation of a memorandum ..., contact a number of sophisticated investors for signs of interest in the proposal, arrange meetings between clients and potential investors, and often assist in the negotiations."

Although the facts of the present case are not identical to those provided in LaSalle National Bank's proposal, the Court finds the OCC's reasoning helpful. Consistent with the concerns that motivated the Banking Act of 1933, the OCC found certain factors weighed in favor of affirming LaSalle's proposal. The letter noted the subsidiary would not purchase any securities for itself or for later resale, and that it would not guarantee successful placement. Additionally, it would not finance the prospective investors' purchases and would not agree to repurchase the securities. Likewise here, these same factors argue that the parties' mutual Agreement is consistent with traditional banking powers and with the concern that commercial banks not participate in prohibited underwriting activities.

Thus, the Court concludes that the Agreement, construed to contemplate Norwest's contacting of potential investors, arranging meetings and participating somewhat in the negotiations, was within Norwest's incidental powers under § 24 Seventh. Because the Court concludes that Norwest's providing financial advice to the Defendants was within its authority as a national bank, and that providing assistance by contacting potential buyers, arranging a meeting, and assisting in negotiations was also within its authority as a national bank, the Court finds the disputed fact to be immaterial.

### B. Self Executing Nature of Incidental Powers

■■■ The Defendants argue that the Regulation Y, 12 C.F.R. § 225, nevertheless required Norwest to apply or provide notice before entering the agreement. That Regulation requires a bank holding company to obtain prior approval by the Federal Reserve Board before the holding company's subsidiary may engage in certain activities. The

Regulation defines "subsidiary" as a "bank or other company that is controlled by another company." 12 C.F.R. § 225.2(7). Thus, argue Defendants, Plaintiff Norwest is a "subsidiary" of Norwest Corporation, and therefore subject to the application and notice provisions of Regulation Y. The Court disagrees.

■■■ While Norwest indeed is a "subsidiary" of Norwest Corporation, it is also a national bank. As discussed, the Comptroller is charged with regulation of national banks and their subsidiaries, and the Fed is charged with the regulation of bank holding companies and their subsidiaries. The Second Circuit has considered the application of the Fed's authority where a bank was the subsidiary of a holding company. In *Independent Insurance Agents of America, Inc., v. Board of Governors of the Federal Reserve System*, 890 F.2d 1275 (2d Cir.1989) (*Merchants II*), cert. denied, 498 U.S. 810, 111 S.Ct. 44, 112 L.Ed.2d 21 (1990), the Fed had already determined that it did not wish to displace the traditional authority of state and national bank chartering authorities to decide what nonbanking activities were appropriate by banks that also happened to be subsidiaries of bank holding companies. The Fed thus interpreted the Bank Holding Company Act as not permitting the Fed to make determinations concerning the scope of insurance and other nonbank activities of bank subsidiaries. The Second Circuit found the Fed's interpretation to be reasonable, and denied the petition for review of the Fed's determination. Broadly read, *Merchants II* stands for the proposition that the Fed lacks authority to regulate bank subsidiaries; that such regulatory authority lies with the agency charged with directly regulating the bank. *See also Citicorp v. Board of Governors of the Federal Reserve System*, 936 F.2d 66 (2d. Cir.1991) (extending *Merchants II* and holding that the Fed also lacks authority to regulate the subsidiary of a holding company's bank subsidiary), cert. denied, 502 U.S. 1031, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992).

■■■ No other circuit court has addressed the issue. While *Merchants II* and *Citicorp* concerned the authority of the Fed to regu-

late state bank subsidiaries and the subsidiaries of those bank subsidiaries, the Court adopts the reasoning of those cases as sound and equally applicable to national bank subsidiaries. Therefore, the Court agrees that the application or notice requirement promulgated by the Fed in 12 C.F.R. § 225.23 does not apply to Norwest as a national bank subsidiary of a bank holding company. Similar to the Fed, the Comptroller has imposed a notice requirement applicable to national banks. 12 C.F.R. § 5.34. By this regulation the Comptroller requires notice when a national bank intends to acquire an operating subsidiary or to perform new tasks in an operating subsidiary. The Defendants do not point to any requirement that a national bank must provide notice before engaging in acts that are within its incidental powers under 12 U.S.C. § 24 Seventh, and the Court is aware of none. By its failure to provide notice or otherwise obtain prior permission, Norwest was not prohibited from contracting to provide advisory services pursuant to the parties' Agreement.

### C. Minnesota License Requirement

 To bring an action to collect compensation for the performance of an act that requires a license under Minnesota Statutes Chapter 82, the claimant must in fact have a license. Minn.Stat. § 82.33 subd. 1. While Minnesota law imposes a license requirement for brokers under chapter 82, Minnesota exempts banks "when engaged in the transaction of business within the scope of its corporate powers as provided by law." Minn.Stat. § 82.18(e). Because Norwest is a bank, and because its Agreement represents a transaction of business Norwest was authorized to undertake pursuant to law, the Court holds that § 82.18(e) exempts Norwest from Minnesota's license requirement. Therefore, § 82.33 subd. 1 does not preclude Norwest from bringing its breach of contract claim and the Court need not reach Norwest's preemption argument.

### D. Contractual Fees Due

The Court turns to the issue of fees due Norwest under the Agreement. The parties dispute the total purchase consideration.

Because the total purchase consideration determines the advisory fee due under the Agreement, the parties dispute the amount now due Norwest.

The Agreement entitles Norwest to an advisory fee, contingent upon the completion of the transaction. The parties agree the transaction has been completed. The purchase consideration determines the fee "due and payable at the time of closing" as follows:

2% of the first $60–million of purchase consideration paid, plus

5% of the next $5–million of purchase consideration paid, plus

10% of amounts of purchase consideration paid above $65–million.

The Agreement also defines "purchase consideration":

Purchase consideration shall include all consideration, present or future, provided to Sween Corporation or its shareholders as seller(s). Such Purchase Consideration shall include but not be limited to the value of (a) payments of cash, stock or notes, (b) indebtedness assumed, (c) management, consulting, non-compete agreements, (d) new or assumed leases and (e) contingent payments (f) cash or non-cash payments made to the Company or to shareholders individually by a purchaser with whom [Norwest] had substantive negotiations regarding the Transaction. For the purpose of computing the amount of purchase consideration, future payments shall be discounted at 8% annually compounded interest and then be deemed to have occurred at closing.

 The total agreed upon purchase price of Sween was $78,500,000, minus later downward adjustments following a post-closing audit. However, as just provided, the Agreement defines purchase consideration not merely as the agreed purchase price. After rendering $72,500,000 in cash at the closing, pursuant to the purchase agreement the purchaser in this case deposited the balance of the purchase price, $6,000,000, into an escrow account. The selling shareholders are to receive the $6,000,000 incrementally; $1,000,000 one year after the closing date, $1,000,000 two years after the closing date,

and the remaining $4,000,000 three years after the closing date, provided there are no breaches of warranty pursuant to the purchase agreement. While Norwest and Defendants agree that this transaction is part of the purchase consideration to determine the fee, they dispute the value that should be afforded it for purposes of calculating the advisory fee. Norwest argues that the value is $6,000,000, because that amount was "purchase consideration *paid*" at closing by the seller. The Defendants argue that it is instead a "future payment," and its value must be discounted to represent the value at the time of closing.

While Norwest's semantic argument is not entirely groundless, if possible, the Court must read the Engagement Agreement as a whole and give each term meaning. The Agreement expressly defines "purchase consideration" as "all consideration, *present or future*, provided *to* Sween Corporation or its shareholders as seller(s)." (emphasis added). So while the "Advisory Fees" section refers to purchase consideration *paid*, the "Purchase Consideration" section of the Agreement clearly contemplates the "value of payments of cash" *to be received* in the future, and provides the formula for valuing such future consideration to shareholders. Thus, although the purchaser "paid" $6,000,000 at the closing, the value of that payment to the shareholders for the purposes of calculating the advisory fee must be determined by its extant value to the shareholders. "[D]iscounted at 8% annually compounded interest" as the parties agreed, and "deemed to have occurred at closing," the closing value of the $6,000,000 paid to the shareholders in escrow was $4,958,594. Therefore this amount will be added to the initial closing cash payment to calculate the total purchase consideration and advisory fee due.

Additionally, the purchase agreement included a $500,000 payment to Maurice Sween for his non-competition covenant, and the parties agree this amount also should be added to the total purchase consideration sum. However, Norwest argues that the additional $500,000 in commissions due former employees, plus $385,000 in indebtedness, also must be included in the purchase consideration total. The Defendants argue that while the Engagement Agreement includes "indebtedness assumed" as purchase consideration, these debts were not actually assumed by the purchaser. However, the Defendants do not dispute that the proposed purchase price of $80,000,000 was negotiated downward to the ultimate price of $78,500,000 to compensate the $500,000 non-competition agreement with Maurice Sween, to compensate the $500,000 present value of commissions due, and to compensate the corporation's indebtedness, which was then estimated at $500,000. That the debtor was the corporation before the purchase agreement and remained the corporation after the agreement does not affect the financial reality that the purchasers and present owners of Sween "assumed" those liabilities in the transaction. The Court concludes that because these liabilities were once the sellers' liabilities through the corporation, and have from the sale become the purchaser's liability through the corporation, the $385,000 debt and $500,000 commissions constitute "indebtedness assumed" by the purchaser, and must be included in the total purchase consideration calculation.

The Court therefore finds that the total purchase consideration and advisory fee is as follows:

| | |
|---|---|
| Cash at Closing | $72,500,000 |
| Closing Value of Future Escrow Payments | $ 4,958,594 |
| Non-competition Agreement | $ 500,000 |
| Bank Indebtedness | $ 385,000 |
| Commission Indebtedness | $ 500,000 |
| Cash Refund Pursuant to Agreement & Audit | $ (753,845) |
| **Total Purchase Consideration** | **$78,089,749** |
| 2% Advisory Fee on first $60,000,000 | $ 1,200,000 |
| 5% Advisory Fee on next $5,000,000 | $ 250,000 |

| | |
|---|---|
| 10% Advisory Fee on remaining $13,089,749 | $ 1,308,975 |
| Plus Unpaid Disbursements | $ 2,732 |
| Retainer | $ (20,000) |
| **Total Advisory Fee** | $ 2,741,707 |

---

Thus the Defendants are liable to Norwest for the payment of $2,741,707 in advisory fees pursuant to their Engagement Agreement.

### E. Costs and Attorneys' Fees

■ Norwest seeks costs and attorneys' fees incurred to bring the present action, and bases this claim on the Engagement Agreement. The Defendants argue that the Engagement Agreement provides attorneys' fees only in "indemnification" actions, and argues that "because there is no third party threatening plaintiff, there is nothing against which it can be indemnified."

The Engagement Agreement includes the following indemnification statement:

> Sween agrees to indemnify and hold Norwest, its affiliates, and its and their directors, officers, employees and agents harmless *against all losses, claims, damages, liabilities, costs and expenses (including attorney's fees) arising out of Norwest's engagement hereunder,* including costs arising out of any dispute whether or not Norwest is a party to such dispute, except to the extent that it is finally judicially determined with respect to any such losses, claims, damages and liabilities that they have resulted from Norwest's negligence or willful misconduct.

(emphasis added; parenthetical included in Engagement Agreement).

Norwest argues that this provision should not be read as limited to third-party indemnity actions only. The Court agrees. Nothing in either the provision or the term "indemnify" requires indemnity only in actions involving third parties. The Defendants could have specified in the contract that the provision reaches "all losses ... *in third party actions,*" had they desired that caveat. Instead, they chose the inclusive term *"all* losses, claims, [etc.]." *See also Blacks Law Dictionary* 769 (6th ed. 1990) (defining "Indemnify" broadly, without limitation to third

party claims); *Id.* at 731 (defining "Hold harmless agreement" similarly). The Court holds the Defendants are liable to Norwest for costs and attorneys' fees under the Engagement Agreement.

### CONCLUSION

The Defendants do not dispute Norwest's Motion to Amend its Complaint and to Dismiss the non-diverse Defendants, and that motion shall be granted in both respects. The Court concludes that providing advice regarding the sale of all or part of Sween Corporation was within Norwest's incidental powers under 12 U.S.C. § 24 Seventh. Additionally, even if the Engagement Agreement is construed as contemplating Norwest's contacting potential investors, arranging meetings and participating to the extent it did in the negotiations, Norwest was nevertheless authorized to enter the Agreement as an activity within its incidental powers under § 24 Seventh. The Defendants have failed to establish that a national bank that is also a subsidiary must provide notice before engaging in acts that are within its incidental powers as a national bank under § 24 Seventh.

Although Minnesota Statutes Chapter 82 imposes a license requirement for brokers, Norwest's Agreement was an activity "within the scope of its corporate powers as provided by law," Minn.Stat. § 82.18(e), and Norwest therefore was exempted from Minnesota's license requirement and not precluded by § 82.33 subd. 1 from bringing this breach of contract claim.

The Court finds that the total purchase consideration involved was $78,089,749, and therefore the total advisory fee under the Agreement is $2,741,707. Additionally, the Court finds that the indemnification provision of the Agreement is not limited to actions involving claims of third parties.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Norwest's Motion to Amend it Complaint and to Dismiss Defendants Sween Corpora-

tion and Keith B. Brekke (Clerk Doc. No. 22) is GRANTED;

a. Defendants Sween Corporation and Keith B. Brekke are dismissed from this action without prejudice;

b. Norwest is granted leave to amend its Complaint in the form of the Amended Complaint Norwest submitted with its motion;

2. Norwest's Motion for Summary Judgment (Clerk Doc. No. 7) is GRANTED;

a. The Defendants shall pay Norwest $2,741,707 in fees due under the parties' Engagement Agreement;

b. The Defendants are liable to Norwest for costs and attorneys' fees in connection with this action and within 15 days of the entry of this Order the parties shall file submissions regarding the amount of costs and attorneys' fees to be awarded; and

3. The Defendants' Motion for Summary Judgment (Clerk Doc. No. 12) is DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**