United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

Nos. 96-1844 and 96-1874

_____

| | |
|---|---|
| Norwest Bank Minnesota, National Association, | * |
| | * |
| | * |
|        Appellee/Cross-Appellant, | * |
| | * |
| | * |
|   v. | *   Appeals from the United States |
| | *   District Court for the District |
| Sween Corporation; Maurice A. Sween; Keith B. Brekke, | *   of |
| | *   Minnesota. |
| | * |
|        Appellants/Cross-Appellees, | * |
| | * |
| Office of the Comptroller of the Currency, | * |
| | * |

Amicus Curiae.

_____

Submitted: February 12, 1997

Filed: July 8, 1997

_____

Before FAGG, HEANEY, and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Norwest brought this action against Sween Corporation, Maurice Sween, and Keith Brekke, seeking a declaratory judgment that its Corporate Finance Division's

business is incidental to its banking business, and that therefore Sween Corporation breached its agreement with Norwest by failing to pay it the advisory fee due under an agreement between Norwest Corporate Finance and Sween Corporation. Norwest asked the court to award it the advisory fee and attorneys' fees and expenses incurred in the action. Sometime after filing the complaint, Norwest dismissed Sween Corporation and Brekke voluntarily, but left Maurice Sween as a defendant. On cross- motions for summary judgment the district court ruled in favor of Norwest. Sween appeals,[1] arguing that the agreement is unenforceable because Norwest's actions under the agreement were not incidental to the business of banking, and that Norwest's acts were beyond its powers because it did not obtain prior approval from the Board of Governors of the Federal Reserve System to enter into the agreement. Even if the agreement is enforceable, Sween argues that the district court incorrectly computed the advisory fee owed to Norwest, and that the agreement's terms do not obligate Sween to pay Norwest's legal fees in this action. Norwest cross-appeals arguing that it is entitled to prejudgment interest on the award granted by the district court. We remand to the district court for the award of prejudgment interest to Norwest, and affirm the district court's judgment in all other respects.

Sween Corporation is a Minnesota corporation that develops and manufactures skin care products for the medical market. Norwest is a national bank established in Minneapolis, Minnesota pursuant to the National Bank Act as amended. Norwest provides investment advisory services related to mergers and acquisitions through a division of Norwest referred to as Norwest Corporate Finance. This division is not a separate legal entity. The common stock of Norwest is owned by Norwest Corporation, a bank holding company governed by the Bank Holding Company Act as

---

[1]Sween Corporation and Brekke also appeal. Because of their earlier dismissal, however, they do not have standing to appeal on any issue except for their dismissal, from which they do not appeal.

amended.[2]  Jeffrey Maas, Peter Slocum, and D. Christian Osborne worked for Norwest in the Norwest Corporate Finance Division when Norwest Corporate Finance[3] and Sween entered into the Engagement Agreement at issue.  None of these three employees has ever been licensed as a Minnesota broker.

An Engagement Agreement between Sween Corporation, Sween, Brekke, and Norwest dated October 10, 1994, authorized Norwest to act as the exclusive advisor to initiate negotiations regarding the sale of all or part of Sween Corporation. Under the terms of the Engagement Agreement, upon the sale of Sween Corporation, Sween Corporation agreed to pay Norwest an advisory fee.

Immediately after October 10, 1994, Norwest prepared and circulated to prospective buyers an extensive brochure promoting Sween Corporation. Norwest contacted in excess of 135 potential buyers.  By December 1994, Sween Corporation agreed to narrow the list to four prospective buyers. These buyers brought teams to Mankato for a week in December to meet with representatives of both Sween Corporation and Norwest for the purpose of investigating and evaluating Sween Corporation.  Two top ranking executives of Coloplast A/S, one of the potential buyers, met with Sween personnel.

After these meetings, Maas was the go-between to the prospective buyers and sellers.  On December 18, 1994, a representative of Coloplast called Maas and said that

---

[2]The common stock of Norwest Bank is owned by Norwest Corporation, Lindeberg Financial Corporation, and Norwest Holding Company.  The common stock of Lindeberg Financial Corporation and Norwest Holding Company, however, are owned by Norwest Corporation.  Therefore, Norwest Corporation, either directly or indirectly, owns all of the common stock of Norwest Bank.

[3]Because Norwest Corporate Finance is simply a division of Norwest, and not a separate legal entity, we will refer to Norwest Corporate Finance as Norwest throughout the rest of this opinion.

Coloplast was prepared to execute a letter of intent to purchase Sween Corporation for $80,000,000. Sween, Brekke, and David Hackley, an attorney representing Sween Corporation, met with a representative of Coloplast to discuss the purchase. Maas also attended the meeting and advised Sween. As a result of this meeting Coloplast entered into a letter of intent in which it agreed to purchase, at its option, either all the assets or all the shares of Sween Corporation on February 28, 1995. The purchase obligation was contingent upon a satisfactory due diligence examination of Sween Corporation, to be followed by the execution of a comprehensive purchase agreement.

During a two-day meeting representatives of Sween Corporation and Coloplast negotiated the terms of the stock purchase agreement. During the first day, Hackley and Douglas Hemer represented Sween Corporation. On one or more occasions, Maas and Sween attended the meetings and participated in negotiations. At the conclusion of this process, Sween Corporation and Coloplast reached a stock purchase agreement. Attorneys represented Sween Corporation at all times through the negotiations leading to the stock purchase agreement. Norwest did not draft or prepare any part of the stock purchase agreement. On February 28, 1995, Sween Corporation transferred all of its shares to Coloplast's Georgia subsidiary. Norwest fully performed its obligations under the Engagement Agreement, but Sween Corporation refused to pay the advisory fee due to Norwest under the Agreement.

Norwest brought this action before the district court seeking a declaratory judgment that its acts under the Engagement Agreement were incidental to its banking business, and that therefore it was not required to have a Minnesota real estate broker's license to maintain an action to collect the advisory fee. Norwest claimed that Sween had breached the Engagement Agreement by failing to pay the advisory fee and asked the court to award the fee, as well as attorneys' fees and expenses in connection with enforcing the Engagement Agreement.

The district court granted summary judgment to Norwest concluding that the acts

engaged in by Norwest under the Engagement Agreement were incidental to the business of banking, and that therefore Norwest and Norwest Corporate Finance's employees were exempt from the Minnesota broker license requirement. See Norwest Bank Minn., Nat'l Ass'n v. Sween Corp., 916 F. Supp. 1494, 1510-11 (D. Minn. 1996). The court also concluded that Norwest was not required to obtain prior approval from the Federal Reserve before entering into the Engagement Agreement. Id. at 1507-08. The court ordered Sween to pay Norwest $2,741,707 in fees due under the Engagement Agreement, and also held Sween liable for Norwest's attorneys' fees in connection with this suit. Id. at 1508-11.

## I.

## A.

The primary issue before us is whether Sween is obligated to pay Norwest the fee that he promised to pay under the Engagement Agreement. Sween argues that Minnesota law prohibits Norwest from collecting the fee. In formulating his argument, Sween first contends that Norwest is a broker under Minnesota law,[4] which Norwest does not dispute. Sween next points to a Minnesota statute that prohibits a person required to be licensed from bringing a suit for collection of compensation for the performance of acts for which a license is required, without proving that the person was licensed properly at the time the alleged action occurred. Minn. Stat. § 82.33, subd. 1 (1996). Sween argues that because neither Norwest Corporate Finance, nor its employees, were licensed as brokers under Minnesota law at the time the parties acted under the Engagement Agreement, Norwest cannot bring this suit to collect the

---

[4]A broker is "any person who . . . for another and for commission, fee, or other valuable consideration or with the intention or expectation of receiving the same directly or indirectly lists, sells, exchanges, buys, rents, manages, offers or attempts to negotiate a sale . . . of any business opportunity or business, or its goodwill, inventory, or fixtures, or any interest therein." Minn. Stat. § 82.17, subd. 4(c) (1996).

advisory fee.

Norwest responds by first pointing to Minnesota Statute section 82.18(e), that exempts various entities, including banks, from the term "broker" when engaged in the transaction of business within the scope of their corporate powers as provided by law. Norwest then asserts that pursuant to the National Bank Act, as a national bank, it had federal authority to enter into the Engagement Agreement and to fulfill its duties under that agreement. See 12 U.S.C. § 24(Seventh) (1994). Sween responds that Norwest's acts went beyond the authority provided to Norwest under the Act. We review a grant of summary judgment de novo. See McKee v. Federal Kemper Life Assurance Co., 927 F.2d 326, 328 (8th Cir. 1991). We will affirm only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The National Bank Act vests each national bank with the authority "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." Id. Though the statute lists a few activities in which banks are authorized to engage, the incidental powers are not confined to activities that are considered essential to the exercise of express powers. See First Nat'l Bank v. Taylor, 907 F.2d 775, 778 (8th Cir.), cert. denied, 498 U.S. 972 (1990). Our analysis thus focuses on whether the acts conducted under the Engagement Agreement fall within the "incidental powers" necessary to carry on the business of a national bank.

The Office of the Comptroller of the Currency, as the administrator charged with the regulation of national banks, has primary responsibility for supervising the "business of banking." See 12 U.S.C. § 27 (1994). It is well established that we must defer to the reasonable judgments of agencies on the meaning of ambiguous terms in statutes that they are charged with administering. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984). See also Smiley v. Citibank (South Dakota), N.A., 116 S. Ct. 1730, 1733-34 (1996) ("[T]he whole point

of <u>Chevron</u> is to leave the discretion provided by the ambiguities of a statute with the implementing agency.") We previously have deferred to the reasonable interpretation of the Comptroller on the meaning of the ambiguous phrase "incidental powers" necessary to carry on the "business of banking." <u>See</u> <u>Taylor</u>, 907 F.2d at 777-78. In addition, recently the Supreme Court has reemphasized the need to defer to the reasonable judgment of the Comptroller on the meaning of ambiguous terms in banking laws that the Comptroller is charged with enforcing. <u>See</u> <u>Smiley</u>, 116 S. Ct. at 1733. "The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberative conclusions as to the meaning of these laws." <u>Nationsbank of N.C. v. Variable Annuity Life Ins. Co.</u>, 513 U.S. 251, 256-57 (1995) (citations and internal quotations omitted).

The Office of the Comptroller of the Currency, through 12 C.F.R. § 7.1002 (1997) and an amicus brief submitted in this appeal,[5] has stated its view that Norwest's acts under the Engagement Agreement fall within a national bank's powers. In 1971 the Comptroller adopted 12 C.F.R. § 7.7200, a regulation that specifically authorized a national bank to act as a "'finder' in bringing together a buyer and seller." The present version of this regulation provides that:

---

[5]The Comptroller's position in this litigation is based on a regulation and long standing policy. We see no evidence that the Comptroller's position is a "'post hoc rationalization advanced by an agency seeking to defend past agency action against attack.'" <u>Lovilia Coal Co. v. Harvey</u>, 109 F.3d 445, 452 (8th Cir. 1997) (quoting <u>Auer v. Robbins</u>, 117 S. Ct. 905, 911 (1997)). The Comptroller is not a party to this action and because "[t]here is simply no reason to suspect that the [Comptroller's] interpretation does not reflect the agency's fair and considered judgment on the matter in question" we will consider whether the Comptroller's view is reasonable. <u>See</u> <u>id.</u> (quotation omitted). The fact that the Comptroller reiterates its position in an amicus brief does not prevent us from considering it. <u>See</u> <u>Skandalis v. Rowe</u>, 14 F.3d 173, 179 (2d Cir. 1994).

(a) <u>General</u>. A national bank may act as a finder in bringing together a buyer and seller.

(b) <u>Qualification</u>. Acting as a finder includes, without limitation, identifying potential parties, making inquiries as to interest, introducing or arranging meetings of interested parties, and otherwise bringing parties together for a transaction that the parties themselves negotiate and consummate. Acting as a finder does not include activities that would characterize the bank as a broker under applicable Federal law.

(c) <u>Advertisement and fee</u>. Unless otherwise prohibited, a national bank may advertise the availability of, and accept a fee for, the services provided pursuant to this section.

12 C.F.R. § 7.1002.

This regulation encompasses most of Norwest's activities under the Engagement Agreement which involved locating suitable buyers for Sween Corporation. In fact, Sween himself concedes in his brief that he "would be pressed if forced to point to significant doings of [Norwest] that would not arguably fit within subparagraph (b) of the amended regulation." In addition, the Office of the Comptroller of the Currency argues that Norwest's role in the negotiations between Sween Corporation and Coloplast is of no consequence because these additional activities also fall within a national bank's incidental powers under 12 U.S.C. § 24(Seventh).

Under <u>Chevron</u>, we must now consider whether the Comptroller's view that Norwest's actions were within a national bank's powers is based on a permissible construction of the National Bank Act. 467 U.S. at 843. Sween argues that neither Norwest nor the Comptroller has articulated why Norwest's acts under the Engagement Agreement were "necessary to carry on the business of banking" because Norwest has not identified any activity in the business of banking that would be impaired, or at least moderately inconvenienced, if Norwest could not conduct this type of business. We emphasize, however, that the "'incidental powers' of national banks are not limited to

-8-

activities that are deemed essential to the exercise of express powers. Rather, courts have analyzed the issue by asking whether the activity is closely related to an express power and is useful in carrying out the business of banking." Taylor, 907 F.2d at 778 (the Comptroller's determination that debt cancellation contracts are within the incidental powers granted by the National Bank Act is reasonable). See also Nationsbank of North Carolina, N.A., 513 U.S. at 257-63 (the Comptroller's determination that national banks may serve as agents in sale of annuities was a reasonable construction of the National Bank Act). The Comptroller explains that Norwest's activities are within the incidental powers necessary to the business of banking because allowing banks to use their expertise as an intermediary effectuating transactions between parties facilitates the flow of money and credit through the economy. The Comptroller further explains that as recognized intermediaries between other nonbank participants in financial markets and payment systems, banks have expertise to effectuate transactions between parties. Finally, the Comptroller emphasizes that it has issued numerous administrative rulings that expressly authorize banks to offer these types of services. We find nothing unreasonable about the Comptroller's view as this type of activity is related to an express banking power and is useful in carrying out the business of banking. See Taylor, 907 F.2d at 778.

**B.**

Sween next argues that he does not have to show that Norwest's conduct does not fit within subparagraph (b) of the amended regulation because the amended regulation is a significant change from the original regulation. The original regulation provided:

> A national bank, pursuant to request, may act as "finder" in bringing together a buyer and seller, where the bank's activity is limited to the introduction and it takes no further part in the negotiations. For this service the bank may accept a fee.

12 C.F.R. § 7.7200 (1996).

Sween contends that the original regulation confined the authorized activities of national banks to the introduction of the buyer and seller, and did not authorize any activities beyond the introduction, but he admits the amended regulation goes further. Because this "significant change" in the law occurred after Norwest entered into and acted under the Engagement Agreement, Sween argues that Norwest cannot use the new regulation to create permission it did not have when it acted under the original regulation.

In Smiley, the Supreme Court deferred to a regulation concerning the definition of "interest" as used in a provision of the National Bank Act even though the Office of the Comptroller of the Currency had passed the regulation after the acts at issue had occurred. 116 S. Ct. at 1733–35. Sween attempts to distinguish Smiley, arguing in his brief that in Smiley the Supreme Court emphasized the critical importance that the new regulation was not a change in existing law, but rather "the first formal enunciation of existing law." The petitioner in Smiley argued that the new regulation was inconsistent with positions taken previously by the Comptroller, and the Supreme Court acknowledged that some interpretative letters from the Office of the Comptroller of the Currency could indicate some "uncertainty and confusion." Id. at 1735. The Court concluded, however, that absent "[s]udden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation . . . change is not invalidating since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency." Id. at 1734 (citations omitted).

Here, Sween offers no evidence of a sudden and unexplained change. Indeed, all evidence presented suggests the new regulation was no different from the allowed practices under the old regulation. For example, the district court cited at least two opinion letters from the Office of the Comptroller of the Currency supporting the view that national banks may provide advisory services regarding mergers and acquisitions.

-10-

916 F. Supp. at 1504-05. Neither letter makes mention of any limitation of this authority beyond the introduction stage. We also look to the discussion in the notice of proposed rule making. "Proposed § 7.1002 revises current § 7.7200 to reflect more recent [Officer of the Comptroller of the Currency] interpretations. The proposal clarifies that a national bank may act as a finder of certain goods and services other than insurance." 60 Fed. Reg. 11924, 11925 (to be codified at 12 C.F.R. § 7.1002) (proposed Mar. 3, 1995). Finally, in the section by section discussion of the final rule adopted, the Comptroller again stressed that the proposal "clarified that a national bank may act as a finder" and observed that section 7.1002 was adopted as proposed. See 61 Fed. Reg. 4849, 4850-51 (to be codified at 12 C.F.R. § 7.1002).

Sween also argues that the amended regulation is a significant change because the distribution table in the Federal Register commented that the amended regulation was a "significant change" from the original regulation. The Supreme Court did not discuss the distribution table in Smiley. However, our review of the distribution table in the Federal Register for the regulation at issue in Smiley, reveals that the table indicated that the amended regulation was a significant change from the original provision. See id. at 4861. We therefore reject Sween's argument and hold that the amended regulation is not a sudden and unexplained change from the original regulation.

**II.**

Sween next argues that Regulation Y, 12 C.F.R. pt. 225, required Norwest to apply or provide notice to the Board of Governors of the Federal Reserve System before entering into the Engagement Agreement. In order to understand this regulation, it is first necessary to consider the relevant statutory framework. The Bank Holding Company Act grants the Federal Reserve principal regulatory power over bank holding companies. See 12 U.S.C. §§ 1842-43 (1994). Section 1842 discusses Federal Reserve approval for acquisition of ownership or control of a bank by a bank holding

company.  Section 1843 discusses a bank holding company's ownership or control of voting shares of any company not a bank and the nonbanking activities of a bank holding company.  This section provides that:

> Except as otherwise provided . . ., no bank holding company shall--
>
> (1) . . . acquire direct or indirect ownership or control of any voting shares of any company which is not a bank, or
> (2) . . . retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company or engage in any activities other than (A) those of banking or of managing or controlling banks and other subsidiaries authorized under this chapter or of furnishing services to or performing services for its subsidiaries, and (B) those permitted under paragraph (8) of subsection (c) of this section [governing notice and approval of services "closely related to banking"] . . .

The Federal Reserve issued Regulation Y pursuant, in part, to the Bank Holding Company Act.  Subpart C of Regulation Y, titled "Nonbanking Activities and Acquisitions by Bank Holding Companies," contains a provision that provides that a bank holding company or a subsidiary may not engage in some activities related to banking without the prior approval of the Federal Reserve in accordance with the requirements of this regulation. See 12 C.F.R. § 225.21(a) (1996).

Sween argues that Norwest's acts under the Engagement Agreement were a type of activity for which prior approval was required because Norwest is a subsidiary of a bank holding company.  Sween contends that because Norwest did not get prior approval from the Federal Reserve it went beyond its powers when it entered into the Engagement Agreement.  Norwest responds that though it is a subsidiary of a bank holding company, because it is a national bank subsidiary, it is not subject to regulation by the Federal Reserve, but only to regulation by the Comptroller.  The Comptroller agrees with Norwest, arguing that the Bank Holding Act does not give the Federal

Reserve the statutory authority to prescribe the permissible activities of national bank subsidiaries of bank holding companies.

The Second Circuit is the only circuit that has addressed the issue of the Federal Reserve's regulatory authority where the subsidiary of a bank holding company at issue was a bank. In Independent Insurance Agents v. Board of Governors, 890 F.2d 1275 (2d Cir. 1989), cert. denied, 498 U.S. 810 (1990), the Federal Reserve interpreted section 1843 of the Bank Holding Company Act that limited the nonbanking activities of bank holding companies. The Federal Reserve found that the Act did not apply to bank subsidiaries of a bank holding company, and thus concluded that it could not regulate the activities of the state bank subsidiary of a bank holding company. Id. at 1279. In the Federal Reserve's view, in enacting the Bank Holding Company Act, Congress did not wish to displace the traditional authority of state and national bank chartering authorities to regulate activities of banking, even though a bank holding company owned the actual banks. Id. at 1280. The Second Circuit applied Chevron analysis and first determined that the statute at issue did not directly address this issue, and then considered whether the Federal Reserve's conclusions were reasonable. Id. at 1281. After a thorough analysis of the Federal Reserve's interpretation of the statute and the legislative history of the Act, the Second Circuit concluded that the Federal Reserve's interpretation was reasonable. Id. at 1279-84. Independent Insurance Agents thus concludes that the Federal Reserve has no authority to regulate the activities of bank subsidiaries of bank holding companies. See also Citicorp v. Board of Governors, 936 F.2d 66, 73-76 (2d Cir. 1991) (extending Independent Insurance Agents and holding that the Federal Reserve also lacks authority to regulate the subsidiary of a holding company's bank subsidiary), cert. denied, 502 U.S. 1031 (1992).

We agree with the district court that the reasoning of the Second Circuit is sound and applicable to this case. We therefore hold that 12 C.F.R. § 225.21(a) does not apply to Norwest as a national bank subsidiary of a bank holding company. We thus

reject Sween's arguments that by failing to provide notice to the Federal Reserve before engaging in the activities under the Engagement Agreement, Norwest was acting beyond its powers, because Norwest was not required to obtain approval from the Federal Reserve.

## III.

Sween next argues that even if the contingent fee agreement is enforceable, its terms do not obligate Sween to pay Norwest's legal fees in this action. The district court did not err in concluding that the indemnification clause included in the Engagement Agreement was not limited to third-party indemnity actions, and we therefore affirm the judgment of the district court on this issue.

On appeal, however, Sween also asserts that the indemnification clause made only Sween Corporation, and not himself or Brekke, liable. Sween argues that when Norwest dismissed Sween Corporation voluntarily, Norwest simultaneously dismissed its claim for attorneys' fees. Sween, however, failed to raise this argument before the district court. In Norwest's motion to dismiss Sween Corporation and Brekke, Norwest argued that because Sween, Brekke, and Sween Corporation had each entered into the Engagement Agreement all three parties were jointly and severally liable, and therefore Norwest could elect to sue the parties jointly or severally. Sween, in its reply before the district court, supported Norwest's motion for voluntary dismissal of Sween Corporation and Brekke conceding that "[n]either Sween Corporation nor Keith Brekke is an indispensable party. If Norwest prevails against Maurice A. Sween as the sole remaining defendant, it is afforded complete relief . . ." Sween's failure to raise the issue that Norwest dismissed its claim for attorneys' fees before the district court prevents us from now considering this argument on appeal. See Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994); Thompson v. Brule, 37 F.3d 1297, 1301 (8th Cir. 1994).

-14-

**IV.**

Finally, Sween argues that even if the Engagement Agreement is enforceable, the district court incorrectly computed part of the advisory fee due to Norwest. After careful review of the district court's analysis, we see no error and we thus affirm the judgment of the district court on this issue.

**V.**

Norwest cross-appeals arguing that the district court erred in failing to include prejudgment interest in its judgment for Norwest. Sween concedes that Norwest is entitled to prejudgment interest. Accordingly, we remand to the district court for the award of prejudgment interest to Norwest, and affirm the judgment of the district court in all other respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.